SCFC ILC, INC., d/b/a Mountainwest Financial, Plaintiff,

v.

VISA U.S.A. INC., Defendant.

VISA U.S.A. INC. and Visa International Service Association, Delaware corporations, Counterclaimants,

v.

SEARS, ROEBUCK AND CO., a New York corporation; Sears Consumer Financial Corporation; and SCFC ILC, Inc., d/b/a Mountainwest Financial, Counterdefendants.

No. 91–C–47B.

United States District Court, D. Utah, C.D.

April 1, 1993.

William H. Pratt, Chicago, IL, Gary F. Bendinger, Salt Lake City, UT, Randall A. Hack, Leonard A. Gail, James D. Sonda, James H. Gale, Chicago, IL, Carol Clawson, Richard W. Giauque, Salt Lake City, UT, for plaintiff.

M. Laurence Popofsky, Stephen V. Bomse, San Francisco, CA, Clark Waddoups, Dale A. Kimball, Heidi E. Leithead, Salt Lake City, UT, Renata M. Sos, San Francisco, CA, Scott R. Ryther, Salt Lake City, UT, for defendant.

William H. Pratt, Chicago, IL, Gary F. Bendinger, Salt Lake City, UT, Randall A.

Hack, Leonard A. Gail, James D. Sonda, James H. Gale, Chicago, IL, Richard W. Giauque, Salt Lake City, UT, Charles A. Tausche, Reuben L. Hedlund, Chicago, IL, for counterdefendant Sears Roebuck & Co.

William H. Pratt, Chicago, IL, Gary F. Bendinger, Salt Lake City, UT, James H. Gale, Randall A. Hack, James D. Sonda, Chicago, IL, Richard W. Giauque, Salt Lake City, UT, for counterdefendant Sears Consumer Financial Corp.

Stephen V. Bomse, Marie L. Fiala, San Francisco, CA, Clark Waddoups, Dale A. Kimball, Heidi E. Leithead, Salt Lake City, UT, Judith Z. Gold, Susan Rice, Robert G. Merritt, San Francisco, CA, Scott R. Ryther, Salt Lake City, UT, Renata M. Sos, San Francisco, CA, for counterclaimant Visa USA Inc.

## OPINION AND ORDER

BENSON, District Judge.

Following a jury verdict in favor of the Plaintiff, a post-trial hearing was held Tuesday, December 22, 1992. The court heard argument on several motions, including: (1) Visa's Motion for Judgment as a Matter of Law under Rule 50(b) of the Federal Rules of Civil Procedure; (2) Visa's Motion for Entry of Judgment on its Clayton Act Counterclaim; and (3) Visa's alternative Motion for New Trial or Conditional New Trial. Sears, as Plaintiff and Counterdefendant, was represented by William H. Pratt and Gary F. Bendinger. Visa, as Defendant and Counterclaimant, was represented by M. Laurence Popofsky, Stephen V. Bomse, Marie L. Fiala, Dale A. Kimball, and Clark Waddoups. Having considered the memoranda, submissions of the parties, and oral argument, the court enters this Opinion and Order.

## BACKGROUND

The Plaintiff in this lawsuit is Mountain-West Financial, a wholly-owned subsidiary of Sears Consumer Financial Corporation and Dean Witter Financial Services Group, which are themselves wholly-owned subsidiaries of Sears, Roebuck and Co.[1] The Defendant is Visa U.S.A., Inc. ("Visa"), a non-stock corporation owned by approximately 6000 banks and other financial institutions located throughout the United States.

Visa's history dates back to the late 1950s when Bank of America began issuing the BankAmericard to consumers through an organization of approximately 70 bank franchises. The BankAmericard was the predecessor to the current Visa charge card. A second charge card association, Interbank, was formed and competed directly with BankAmericard. Interbank is now known as MasterCard.

Visa is a form of a joint venture governed by a board of directors which is comprised of bank executives selected from member banks. Visa divides the United States into twelve regions. Member banks in each region elect one director to the board. Large regions are represented by more than one director. In addition, one director is elected by the small banks to represent their interests. Furthermore, any member with more than ten percent of the total volume of outstanding Visa cards receives an automatic position on the Board.

The Visa association itself does not issue charge cards. It provides services to its members, including general advertising and computer services. Visa cards are issued by the individual members. Each of the 6000 members is allowed to set its own terms, deciding what prices to charge and the number of cards to issue.

When the Visa association was formed, its rules prevented members from also belonging to MasterCard. In 1974, a bank in Little Rock, Arkansas, sued for the right to issue both Visa cards and MasterCard cards. *See Worthen Bank & Trust Co. v. National Bankamericard, Inc.,* 345 F.Supp. 1309 (E.D.Ark.1972), *rev'd,* 485 F.2d 119 (8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). In response, Visa sought advice from the United States Department of Justice to determine whether this prohibition could be considered an anti-

---

1. During trial and in previous decisions, the court has referred to the plaintiff as "Sears." In this Opinion, the court will continue that practice.

trust violation. The Justice Department responded by stating that, on the card-issuing level, such a "prohibition of dual affiliation appears unobjectionable." (Def.'s Ex. 102, at 2). With respect to the enlistment of merchants willing to accept the Visa card, however, the Justice Department's opinion was that the bar to dual membership could handicap efforts to create new bank credit card systems and might diminish competition. In other words, the Department of Justice found no problem with prohibiting a bank from issuing both Visa and MasterCard cards, but prohibiting dual affiliation by those banks responsible for signing merchants could pose an antitrust problem. As a result, the Department of Justice concluded that it could not promise that a civil action against Visa would not be initiated if Visa continued to refuse its members the right to issue MasterCard charge cards. In response, Visa withdrew its rule, settled the lawsuit, and allowed its members to also become members of the MasterCard association. Thereafter, most banks and other financial institutions in the United States became members of both Visa and MasterCard. Presently, most Visa members also issue MasterCard cards, a practice known as "duality." Visa contended in this action that as a result of duality, competition between Visa and MasterCard diminished significantly.

In 1982, Sears began investigating an entrance into the general purpose charge card market.[2] Sears had discussions with Visa about the possibility of Sears' issuing a nationwide Visa card. Sears organized a steering committee to recommend a strategy. The committee considered Sears' becoming a member of Visa or MasterCard. The committee also considered developing a new general purpose charge card. In late 1984, Sears decided not to pursue issuing a Visa card at that time, but instead decided to launch its own proprietary card [3]—the Discover Card. The Discover Card was introduced in Atlanta, Georgia, in late 1985, and was issued nationally in 1986.

Visa perceived the Discover Card as a direct competitor and made numerous attempts to limit the Discover Card's success. For example, Visa encouraged its member banks to deny the Discover Card access to Visa's merchant card terminals. This strategy forced Sears to develop its own terminals and to offer them to merchants at competitive prices. Thereafter, Visa refused to allow its merchants to process Visa transactions on a Discover Card terminal.[4] Despite Visa's efforts, however, Discover continued to grow and prosper.[5]

In late 1988, Sears applied for membership in Visa through Greenwood Trust Co., a Delaware bank owned by Sears. Sears claims that its primary reason for applying for membership was in response to the competitive actions Visa had undertaken with respect to the Discover Card. In June, 1989, Visa's Board of Directors held a meeting in Cannes, France. At the meeting, the Board considered and unanimously rejected Greenwood Trust's application for membership. The Board also passed an amendment to its by-

2. The general purpose charge card market was defined at trial as consisting of any charge card which could be used for general purposes at a wide variety of retail establishments. Gasoline charge cards, department store charge cards, and other charge cards accepted only at limited locations were not considered to be general purpose charge cards. At the time Sears began its investigation there were five general purpose charge cards distributed nationwide: Visa, MasterCard, American Express, Diners Club, and Carte Blanche.

3. Proprietary cards were defined at trial as charge cards owned and distributed solely by a single business entity. At the time Sears entered the general purpose charge card market with the Discover Card in 1985, the only other issuers of proprietary general purpose charge cards were

American Express and Citibank (Diners Club/Carte Blanche).

4. Eventually Visa and Sears resolved their disputes regarding the use of terminals, allowing merchants to use the same terminals for both cards.

5. The evidence at trial indicated that the Discover Card is one of the most effective competitors in the general purpose charge card market. The Discover Card has surpassed its business projections in every year of its existence, earning $80 million in net income in 1989, $117 million in 1990, and $170 million in 1991. (Def.'s Ex. 571). Discover Card has been referred to as "one of the two or three most remarkable success stories in American business in the late 1980s[.]" (Tr. at 256).

laws prohibiting Sears, or any other direct competitor, from becoming a Visa member. The following is an excerpt from the official minutes of the meeting of the Board, dated June 5–6, 1989:

> Greenwood Trust Company has made application for Principal membership in the corporation. Greenwood Trust Company is the issuer of Discover cards and has no intention of converting that program; rather, they intend to issue both Discover cards and Visa Cards. In order to preserve and enhance interbrand competition, and upon motion duly made, seconded and unanimously carried, it was
>
> > **RESOLVED,** that Section 2.06 of the By–Laws be and are hereby amended by adding the following sentence at the end of that Section as follows:
> >
> > > "Notwithstanding (a) above, if permitted by applicable law, the corporation shall not accept for membership any applicant which is issuing, directly or indirectly, Discover cards or American Express cards, or any other cards deemed competitive by the Board of Directors; an applicant shall be deemed to be issuing such cards if its parent, subsidiary or affiliate issues such cards."

(Pl.'s Ex. 715)

In a letter advising Sears of the Board's action, Visa General Counsel Bennett Katz stated: "[W]e believe that intersystem competition should be preserved and enhanced; membership by Greenwood Trust Co. would have the opposite effect." (Pl.'s Ex. 715). Sears contested Visa's rejection of its application. Sears' officers met with Visa board members in an attempt to resolve the situation, but Visa refused to change its position. Sears threatened antitrust litigation, but took no legal action at that time.

On May 25, 1990, Sears purchased the assets of a small, defunct Utah savings and loan association known as MountainWest Savings & Loan ("MountainWest Savings"). The purchase was made through the Resolution Trust Corporation ("RTC"), which had become the receiver of MountainWest Savings after its failure. Sears merged the assets of MountainWest Savings into those of Basin Loans, a Utah Industrial Loan Company, and renamed the new entity SCFC ILC, Inc., doing business in Sandy, Utah, as "MountainWest Financial."

One of the assets of MountainWest Savings that Sears acquired from the RTC was MountainWest Savings' membership in the Visa association. MountainWest Savings had become a Visa member in 1982 and had issued approximately 5800 Visa charge cards to its account holders. Notwithstanding Visa Bylaw 2.06, Sears attempted to use MountainWest Financial's Visa membership to launch a special low-interest, Sears-owned Visa card called "Prime Option." Under the Prime Option program, Sears intended to issue millions of Visa cards nationwide. Sears initially requested a printing of 1.5 million Prime Option Visa cards. Upon learning, rather belatedly, of Sears' involvement with MountainWest Financial, Visa refused to grant permission for the initial printing of the Prime Option Visa cards based on Bylaw 2.06's prohibition of Sears' membership in Visa.[6]

In response to Visa's refusal to approve MountainWest Financial's request, Sears filed a five-count Complaint against Visa in the Federal District Court for the District of Utah, on January 17, 1991. Counts I and II raise claims under Section 1 of the Sherman Act, 15 U.S.C. § 1; Counts III and IV raise claims under the Utah Antitrust Act, Utah Code Ann. §§ 76–10–911 to—926; and Count V raises a claim under the Utah Unfair Practices Act, Utah Code Ann. §§ 13–5–1 to –18. Included in Sears' prayer for relief was a request for a permanent injunction.

Shortly after the complaint was filed, Sears moved for a preliminary injunction seeking to compel Visa to allow the launch of the Prime Option Visa card program. Sears' motion was granted by the court. 763

---

6. Sears attempted to gain entry into Visa without clearly disclosing to Visa its affiliation with MountainWest Financial. Aware of Bylaw 2.06, MountainWest Financial failed to reveal to Visa its affiliation with Sears and the Discover Card. Visa discovered that MountainWest Financial was actually owned by Sears only after conducting its own investigation. Visa has pending against Sears a counterclaim for fraud.

F.Supp. 1094 (D.Utah 1991). The court found that MountainWest Savings' Visa membership had never been terminated, and that Sears was "entitled to enjoy all of the rights and privileges of membership, including the right to launch the 'Prime Option' program." *Id.* at 1098–99. The court further found that issuance of the preliminary injunction would not alter the status quo and that the other requirements necessary for a preliminary injunction had been met. *Id.* at 1100.

Visa appealed the district court's ruling to the United States Court of Appeals for the Tenth Circuit. On June 18, 1991, the Tenth Circuit reversed the holding of the district court, finding that the preliminary injunction would in fact alter the status quo and that Sears, under such circumstances, had not met the heavy burden required for a preliminary injunction. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1102 (10th Cir. 1991). The case was remanded to the district court for further proceedings.

On March 25, 1991, Visa filed an Answer to the Complaint which included a Counterclaim against Sears. Count I of the Counterclaim raises a claim of Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114; Count II alleges a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Count III alleges fraud; Count IV raises a claim for unfair trade practices under California law; and Count V raises, in the alternative, a claim for breach of contract.

The parties then resumed discovery in preparation for trial. Another twist was added to this litigation, however, when on December 19, 1991, President Bush signed into law a statute dealing with RTC-transferred institutions. The statute amended the Home Owners' Loan Act, 12 U.S.C. § 1441a, by adding a new subsection, (q), as follows:

*Continuation of obligation to provide services*

No person obligated to provide services to an insured depository institution at the time the Resolution Trust Corporation is appointed conservator or receiver for the institution shall fail to provide those services to any person to whom the right to receive those services was transferred by the Resolution Trust Corporation after August 9, 1989, unless the refusal is based on the transferee's failure to comply with any material term or condition of the original obligation. This subsection does not limit any authority of the Resolution Trust Corporation as conservator or receiver under section 11(e) of the Federal Deposit Insurance Act.

Federal Deposit Insurance Corporation Improvement Act of 1991 § 471, Pub.L.No. 102–242, 105 Stat. 2385 ("Section 471"). Pursuant to this section, persons under contract to provide services to a federal deposit institution prior to its takeover by the RTC are required to continue to provide those services after transfer by the RTC to a new owner— so long as the new owner complies with all of the terms and conditions of the original contract.

In response to the enactment of this statute, Sears amended its Complaint, alleging that Visa's refusal to issue the credit cards sought by Sears constituted a violation of Section 471. Sears moved for summary judgment on that basis. On February 18, 1992, the court denied the motion, finding that Bylaw 2.06's prohibition of affiliation with Sears was a material condition of the original agreement between Visa and MountainWest Savings. 784 F.Supp. 822, 834 (D.Utah 1992). Because MountainWest Savings was bound by the bylaw, the restriction was also effective as to MountainWest Financial, pursuant to the terms of Section 471. *Id.*

On July 30, 1992, the court heard oral argument on various additional motions filed by the parties. These motions included: 1) Visa's Motion for Summary Judgment on Sears' Sherman Act Claim; 2) Sears' Motion for Summary Judgment on Visa's Clayton Act Counterclaim; 3) Sears' Motion for Summary Judgment on Visa's Non-antitrust Counterclaims; and 4) Sears' Motion to Bifurcate the trials of the antitrust and non-antitrust claims. The court denied all motions for summary judgment, finding genuine issues of material fact which required a determination by the trier-of-fact at trial. The court, however, granted Sears' motion to bifurcate the trial. 801 F.Supp. 517, 528–29

(D.Utah 1992). The initial trial would concern only the liability aspects of the antitrust claims. The damages portion of the antitrust claims, as well as all non-antitrust claims, would be tried at a later date, if necessary. Id.

Trial began on October 13, 1992. Sears' Sherman Act claim was presented to an eleven-person jury,[7] while, at the same time, Visa's Clayton Act claim was tried to the court. With respect to Sears' Sherman Act claim, the dispute focused on whether the restraint of trade imposed by Bylaw 2.06 is "unreasonable." Sears asserted that the restraint is unreasonable because it substantially harms competition in the relevant market.

For purposes of this lawsuit, it was agreed by both parties that the relevant market is the general purpose charge card market in the United States. At the time of trial, the issuers of general purpose charge cards in the United States were the Visa and Master-Card associations, American Express, Citibank (Diners Club and Carte Blanche), and Sears (the Discover Card). Visa was estimated to possess 45.6% of the nationwide general purpose charge card market; MasterCard, 26.4%;[8] American Express, 20.5%; Discover Card, 5.5%; and Diners Club, 2.0%. Competition among these five brands is known as interbrand or "intersystem" competition. Competition among association members, such as Visa members, is known as intrabrand or "intrasystem" competition.

Sears argued at trial that Bylaw 2.06 hinders competition by excluding Sears' planned Prime Option Visa card from being offered in the market. Sears asserted that the Prime Option Visa card would be a low-cost, highly competitive addition to the Visa system. Bylaw 2.06, it was argued, harms consumers because it prevents them from gaining access to the card, thereby hindering intrasystem competition within the Visa system. At the time of trial, this exclusion only applied to two entities—Sears and American Express. In the estimation of Visa's Board of Directors, no other entity was issuing a "competitive" card in the relevant market.

Sears also asserted that Bylaw 2.06 harms competition by discouraging the creation and development of other proprietary cards. Bylaw 2.06, it was argued, punishes those who may seek to offer a successful, competitive proprietary card, such as the Discover Card. Because of the bylaw, non-Visa members who develop a successful proprietary card would be prohibited from joining the Visa system and current Visa members would be expelled from the system if they developed such a card.

In response to Sears' arguments, Visa asserted that Bylaw 2.06 is not unreasonable. Visa maintained that the bylaw is beneficial, rather than harmful, to competition. It asserted that the exclusion of Sears from the Visa association preserves intersystem competition because Discover Card is one of the few successful intersystem competitors with Visa in the relevant market. Allowing Sears to join the Visa system would arguably weaken intersystem competition between Visa and Discover. Thus, Visa submitted, Bylaw 2.06 actually enhances competition in the relevant market. Furthermore, Visa argued that any harmful effects of Sears' exclusion are insubstantial. Because Visa does not set restrictions on the price or output of Visa cards issued by its member banks, it was argued that the present intrasystem competition is vigorous and the exclusion of Sears cannot possibly have a substantial, negative impact on competition in the relevant market.

---

7. A 12-person jury was initially selected. One of the jurors, however, failed to appear on the first day of trial following jury selection and before the presentation of opening statements. The court proceeded with 11 jurors, with the agreement of counsel for both parties, and in accordance with Rule 48 of the Federal Rules of Civil Procedure.

8. Evidence at trial showed that in 1991 the ten largest issuers of Visa and MasterCard accounted for approximately 48% of the total Visa/Master-Card charge volume. The top-ten issuers were Citicorp, First Chicago, AT & T, Chase Manhattan, MBNA America, Bank of America, Nationsbank, Chemical Bank, Banc One, and Wells Fargo Bank. The largest issuer, Citicorp, accounted for approximately $42.5 billion in charge volume in 1991—representing approximately 15.8% of the Visa/MasterCard market and 11.4% of the entire general purpose charge card market.

Following a three and one-half week trial, and two days of deliberation, the jury returned a verdict pursuant to special interrogatories, as follows:

**QUESTION NO. 1:** Has Sears proved, by a preponderance of the evidence, that Visa's Bylaw 2.06 has a substantially harmful effect on competition in the relevant market?

Yes _X_ . No ___ .

**QUESTION NO. 2:** Has Sears proved, by a preponderance of the evidence, that the harmful effect substantially outweighs any beneficial effect on competition in the relevant market?

Yes _X_ . No. ___ .

**QUESTION NO. 3:** Has Sears proved, by a preponderance of the evidence, that it was injured by Visa's Bylaw 2.06?

Yes _X_ . No ___ .

Following trial, the parties filed the post-trial motions presently pending before the court. After hearing oral argument, the court took the motions under advisement. The court now rules on Visa's Rule 50(b) Motion for Judgment as a Matter of Law on Sears' Sherman Act claim, Visa's Rule 50(b) Motion for Judgment as a Matter of Law on its Clayton Act Counterclaim, and alternatively, Visa's Rule 59 Motion for a New Trial.

## DISCUSSION

### I. VISA'S RULE 50(b) MOTION— THE SHERMAN ACT

Visa argues that Sears' Sherman Act claim must fail as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. Visa raises two general arguments. First, Visa argues that Sears' claim is legally insufficient and should never have gone to the jury. This argument is based on general economic principles, including notions of pri-

vate property and the preservation of efficiency-enhancing joint ventures. Next, Visa argues that the facts of this case are so lacking that no reasonable jury could have ruled in Sears' favor. For organizational purposes, the court will refer to the former as Visa's "legal argument" and to the latter as Visa's "factual argument," recognizing, of course, the essentially legal nature of each argument under Rule 50(b), as well as the considerable overlap of the factors that pertain to both arguments.

### A. Visa's "Legal Argument"

Visa's legal argument has been presented several times to the court.[9] The argument has evolved and changed somewhat over time, having been articulated slightly differently each time it has been presented. In each instance, however, the central theme of Visa's legal argument has remained the same: that under the circumstances of this case, the restraint imposed by Bylaw 2.06 cannot violate the antitrust laws. Visa contends that when a joint venture such as Visa does nothing more than refuse to share its property with a successful competitor such as Sears, there can be no violation of Section 1 of the Sherman Act.

#### 1. Legal Structure of the Sherman Act

█ Before addressing the details of Visa's legal argument, it is helpful to examine Section 1 of the Sherman Act and the legal requirements necessary to establish a violation of that section. Section 1 provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

15 U.S.C.A. § 1 (Supp.1992).[10] The plain language of the section appears to prohibit

---

**9.** Visa first raised the argument in support of its Motion for Summary Judgment. The court denied the motion in a written opinion. *SCFC ILC, Inc. v. Visa U.S.A., Inc.*, 801 F.Supp. 517, 523 (D.Utah 1992). Thereafter, the issue was raised again in connection with Visa's Motion for Certification for Interlocutory Appeal under 28 U.S.C. § 1292(b), which the court denied. The argument was again presented at the close of Sears' case at trial as Visa's Motion for Judgment as a

Matter of Law under Rule 50(a) of the Federal Rules of Civil Procedure. Finally, Visa raises the issue in support of this Rule 50(b) Motion for Judgment as a Matter of Law.

**10.** Sears' claim is actually one for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Although Section 1 of the Sherman Act provides for criminal penalties, Section 4 of the Clayton Act allows for private enforcement of the anti-

*all* restraints of trade. However, courts determined early on that the section was not intended to be applied so broadly, finding that "restraint is the very essence of every contract," and "read literally, § 1 would outlaw the entire body of private contract law." *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *see also Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). As a result, it has been clearly established that a restraint of trade does not violate Section 1 unless it is found to be "unreasonable." A restraint of trade is unreasonable if it substantially harms competition in the relevant market to the extent that the harmful effects substantially outweigh any beneficial effects. This process of determining whether a restraint is unreasonable is known as the "Rule of Reason." *See Standard Oil Co. v. United States,* 221 U.S. 1, 67, 31 S.Ct. 502, 518, 55 L.Ed. 619 (1911); *Board of Trade,* 246 U.S. at 238–39, 38 S.Ct. at 243–44; *Professional Engineers,* 435 U.S. at 687–88, 98 S.Ct. at 1363; *Reazin v. Blue Cross & Blue Shield,* 899 F.2d 951, 960 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990).

### a. The Rule of Reason

"[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *Professional Engineers,* 435 U.S. at 691, 98 S.Ct. at 1365. This determination is generally made by the trier-of-fact. "[T]he factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* at 691 n. 17, 98 S.Ct. at 1365 n. 17. The fact-finder must examine "a variety of actual market factors" in making this determination. *Smith Mach. Co. v. Hesston Corp.,* 878 F.2d 1290, 1298 (10th Cir.1989), *cert. denied,* 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990). This includes an

analysis of the restraint imposed—the nature and history of the restraint, and whether the restraint affects price, output, or product quality. The fact-finder may also examine the relevant market—the structure of the market, the parties' positions in the market, and the nature of the market before and after the restraint was imposed. *Board of Trade,* 246 U.S. at 238–39, 38 S.Ct. at 243–44. Furthermore, a Rule of Reason analysis may include an examination of the party's purpose in imposing the restraint.

Visa correctly observes that not all Section 1 cases must be submitted to a jury. A complete Rule of Reason inquiry often requires a protracted and complicated examination of the relevant facts. As a result, courts have developed presumptions, or "screens," as Visa calls them in its briefs, to filter out those cases which do not require full Rule of Reason analysis by the fact-finder at trial, but rather, may be decided as a matter of law.

### b. Per Se Illegality

The first presumption developed by the courts is the rule of *per se* illegality. "*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *NCAA v. Board of Regents of the Univ. of Okla.,* 468 U.S. 85, 103–04, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984). Certain activities are so facially pernicious that they are declared presumptively unreasonable by the court. Agreements and practices which are "plainly anticompetitive," *Professional Engineers,* 435 U.S. at 692, 98 S.Ct. at 1365, and which are lacking in "any redeeming virtue," *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), are presumed to be illegal without conducting a detailed Rule of Reason analysis. Price fixing and bid rigging are examples of these types of activities.

trust laws by private parties. Section 4 provides in relevant part:

... any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue there-

for in any district court of the United States in the district in which the defendant resides or is found or has an agent....

15 U.S.C.A. § 15 (Supp.1992).

The United States Supreme Court has explained the benefits of the *per se* analysis approach:

> This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertak-·en.

*Northern Pacific*, 356 U.S. at 5, 78 S.Ct. at 518.

█ Courts, however, are hesitant to find alleged restraints of trade illegal *per se*. The anticompetitive effect must be relatively certain. *See United States v. Topco Assocs.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act."). Even when the *per se* presumption appears to be proper, the presumption will not be applied if the restraint could possibly have legitimate, beneficial effects or if the restraint is such that it is necessary for the product to exist at all.[11]

█ Regardless whether a restraint is subjected to a full Rule of Reason analysis or a presumption, the "essential inquiry" is the same—whether the restraint substantially harms competition in the relevant market.

*NCAA*, 468 U.S. at 104, 104 S.Ct. at 2961. "[T]here is often no bright line separating *per se* from Rule of Reason analysis." *Id.* at 104 n. 26, 104 S.Ct. at 2962 n. 26.

### c. Legal "Screens" for Nonviolations

At the opposite end of the spectrum from *per se* illegality, courts will sometimes find a restraint "reasonable," or perhaps more accurately, "not unreasonable" as a matter of law. This occurs when no reasonable factfinder could find the restraint to be unreasonable, and therefore submitting it to the jury for a complete Rule of Reason analysis would not be of value. Based on current precedent, there appear to be two general types of cases in this category.

█ The first situation arises when it can be shown that the defendant does not possess market power. "Market power is the ability to raise prices above those that would be charged in a competitive market." *NCAA*, 468 U.S. at 109 n. 38, 104 S.Ct. at 2964 n. 38. The plaintiff bears the burden of proving that the defendant possessed and exercised market power.[12] "To demonstrate 'market power,' a plaintiff may show evidence of *either* 'power to control prices' *or* 'the power to exclude competition.'" · *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1225–26 n. 3 (10th Cir.1986), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988) (emphasis in original). A restraint is not unreasonable under the antitrust laws unless it substantially harms competition. When a defendant lacks market power, it lacks the ability to substantially

**11.** Joint ventures often fall into this category. *See North Am. Soccer League v. National Football League*, 670 F.2d 1249, 1259 (2d Cir.), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982) ("Because agreements between members of a joint venture can under some circumstances have legitimate purposes as well as anticompetitive effects, they are subject to scrutiny under the rules of reason."); *NCAA*, 468 U.S. at 100–01, 104 S.Ct. at 2960 (*Per se* analysis inappropriate in an industry in which "horizontal restraints on competition are essential if the product is to be available at all."); *Broadcast Music, Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the

agreement on price is necessary to market the product at all.") Furthermore, the *per se* presumption will not be used against a joint venture if the defendant lacks market power or exclusive access to an essential facility. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 296–98, 105 S.Ct. 2613, 2620–21, 86 L.Ed.2d 202 (1985).

**12.** In some circumstances, not applicable to this case, detailed evidence of market power may be unnecessary. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986); *Reazin v. Blue Cross & Blue Shield*, 899 F.2d 951, 968 n. 24 (10th Cir.), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990).

harm competition. Consequently, when the evidence clearly demonstrates an absence of market power, no reasonable jury could find the restraint to be unreasonable. Under such circumstances, a court may declare the restraint not unreasonable as a matter of law and dismiss the claim without submitting it to a jury. *Capital Imaging Assocs. v. Mohawk Valley Medical Assocs.*, 791 F.Supp. 956, 966–67 (N.D.N.Y.1992); *see Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 482 (3d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992); *Rebel Oil Co. v. Atlantic Richfield Co.*, 808 F.Supp. 1464, 1466 (D.Nev. 1992).

■ The second type of circumstance in which a restraint was found to be "not unreasonable" as a matter of law was recognized in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597, 106 S.Ct. 1348, 1361, 89 L.Ed.2d 538 (1986). There, the Court found that when a plaintiff's theory of violation does not "make economic sense," dismissal is appropriate. *See also Eastman Kodak Co. v. Image Technical Servs.*, — U.S. —, —, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992).

The central focus of Visa's legal argument is that the court should apply a shorthand presumption or screen to dismiss Sears' claim without submitting it to a jury. Visa argues that such a dismissal is warranted under the market power and economic sense screens. In addition, Visa proposes that the court adopt a new screen, based upon economic principles, to declare Bylaw 2.06 not unreasonable as a matter of law. The court will now evaluate Visa's position under these three screens.

### 2. The Market Power Screen

■ Visa claims the court should find no Sherman Act violation because, as a matter of law, Bylaw 2.06 was not an exercise of market power. Visa submits that because the bylaw does not restrict competition or control the price or output of Visa cards within the Visa system, it cannot be an exercise of market power.

The court finds, however, that the market power screen is not applicable in this case. The market power screen is based on the *existence* rather than the *exercise* of market power. If the relevant facts clearly demonstrate an absence of market power, the court may dismiss the case. If the court determines, however, that there is sufficient evidence from which a reasonable fact-finder could find the existence of market power, the case must be submitted to the jury. The jury then determines factually whether the defendant possessed market power, and, if so, whether the defendant exercised market power to unreasonably restrain trade.

At trial, Sears presented sufficient evidence of Visa's market power to allow this case to proceed to the jury. The evidence showed that Visa members control 45.6% of the relevant market through the Visa system. This fact alone suggests the existence of market power. The evidence also showed that Visa members, through their membership in the MasterCard association, control an additional 24.6% of the market—for a total of 72%.[13] Sears' expert witness, Professor James Kearl, testified that this position in the relevant market gives Visa members the ability to collectively exercise market power. Accordingly, the court finds there was sufficient evidence of Visa's market power to support a submission to the jury regarding the possession and exercise of that power.

### 3. The Economic Sense Screen

■ Visa next argues that Sears' theory of a Sherman Act violation makes no economic sense. This argument is based on the United States Supreme Court's rulings in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Eastman Kodak Co. v. Image Technical Services, Inc.*, — U.S. —, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), in which the Court recognized that a case may be dismissed when the plaintiff's theory

---

13. In *1991*, for example, the top five Visa/MasterCard issuers controlled 36.7% of the total charge volume for the two associations. (Pl.'s Ex. 752).

Those five issuers were Citicorp, First Chicago, AT & T Universal, Chase Manhattan, and MBNA America.

regarding the defendant's alleged restraint of trade makes no economic sense. Under this theory, Visa claims, the court should apply a similar "screen" to find that Bylaw 2.06 is not unreasonable as a matter of law.

Visa bases this argument on the inherent economic benefits of a joint venture, and the claim that a joint venture's exercise of its property rights cannot substantially harm competition. Specifically, Visa emphasizes that Bylaw 2.06 does not restrict competition as to price or output. Competition among the 6000 members is said to be vigorous, and therefore the exclusion of one additional competitor cannot harm competition. Visa argues that any challenge to such conduct is economically unsound.

Visa's reliance on the concept of no economic sense used in *Matsushita* and recognized in *Eastman Kodak* is misplaced in the present case. In both *Matsushita* and *Eastman Kodak*, the focus of the economic sense inquiry centered on whether the alleged restraint of trade was economically detrimental to the defendant. If the alleged restraint were significantly detrimental, the plaintiff's argument could be said to make no economic sense and dismissal could be appropriate.

For example, in *Matsushita*, American television manufacturers alleged that Japanese manufacturers, over a twenty-year period, had illegally conspired to drive American firms from the market. 475 U.S. at 577, 106 S.Ct. at 1351. This conspiracy allegedly focused on a "scheme to raise, fix and maintain artificially *high* prices for television receivers sold by [the defendants] in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States." *Id.* at 578, 106 S.Ct. at 1351 (emphasis in original). The Court found that a conspiracy to depress prices in the American market to drive out American competitors was implausible because it required the conspirators to incur substantial losses to recover uncertain gains. *Id.* at 590, 106 S.Ct. at 1357. As such, the Court found

the allegation made no economic sense because "as presumably rational businesses, [defendants] had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for [defendants] with no corresponding gains." *Id.* at 595, 106 S.Ct. at 1360. The Court concluded that if the defendants had "no rational economic motive to conspire, and if their conduct [was] consistent with other, equally plausible explanations, the conduct [would] not give rise to an inference of conspiracy," and summary judgment was appropriate.[14] *Id.* at 596–97, 106 S.Ct. at 1361.

Using the *Matsushita* case as a foundation, the concept of "no economic sense" was also used as a defense in *Eastman Kodak*. There, defendant Eastman Kodak, a manufacturer of photocopiers and related equipment, instituted a policy of selling parts only to those who had purchased Kodak equipment, and those who used Kodak service or did their own repairs. —— U.S. at ——, 112 S.Ct. at 2076–77. After several independent service companies were forced out of business, a group brought suit alleging that Kodak "had unlawfully tied the sale of service for Kodak machines to the sale of parts." *Id.,* —— U.S. at ——, 112 S.Ct. at 2078. In response, Kodak argued that it made no economic sense for Kodak to raise "its parts or service prices above competitive levels" because potential customers would simply stop buying Kodak equipment. *Id.,* —— U.S. at ——, 112 S.Ct. at 2084.

On this basis, Kodak argued that the Court, as a matter of law, should accept a "basic economic reality" that competition in the equipment market would prevent market power in the parts and service areas. *Id.* The Court rejected this argument, finding that it was possible for Kodak to lose equipment sales and still not suffer economic detriment. *Id.,* —— U.S. at ——, 112 S.Ct. at 2084–88. "The sales of even a monopolist are reduced when it sells goods at a monopoly price, but the higher price more than

---

**14.** The case was remanded to the United States Court of Appeals for the Third Circuit which was then "free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that [defendants] conspired to price predatorily for two decades despite the absence of any apparent motive to do so." *Matsushita,* 475 U.S. at 597, 106 S.Ct. at 1362.

972

compensates for the loss in sales." *Id.,* ——
U.S. at ——, 112 S.Ct. at 2084. As a result,
the Court concluded that the plaintiff's argu-
ment made sufficient "economic sense" to
avoid dismissal. *Id.,* —— U.S. at ——, 112
S.Ct. at 2088.

In the instant case, Visa argues, in effect,
that Sears' antitrust allegation against Visa
makes no economic sense. However, unlike
the defendants in *Matsushita* and *Eastman
Kodak,* Visa does not base this argument on
any claim that Bylaw 2.06, as interpreted by
Sears, is economically detrimental to Visa
members. Rather, Visa claims that Sears'
argument should be dismissed as a matter of
law because joint ventures have inherent eco-
nomic benefits. The court finds that Visa's
argument is not consistent with the economic
sense screen described by the Supreme
Court.

■ Even if Visa's argument of no eco-
nomic sense were based on claims of econom-
ic detriment to Visa, there was sufficient
evidence presented by Sears to rebut the
claim and warrant a submission of the issue
to the jury. Sears alleged that Bylaw 2.06
was designed to economically benefit Visa
members by excluding Prime Option Visa, a
potentially large-scale, low-cost competitor in
the general purpose charge card market.
This exclusion, Sears argued, restricts com-
petition within the Visa system, thereby al-
lowing current members to keep prices artifi-
cially high.

In evaluating Sears' theory of anticompeti-
tive effects, the court does not find Sears'
claims to be economically implausible or
senseless. Despite the fact that competition
within the Visa system is said to be vigorous,
there is evidence to support a reasonable
jury finding that Bylaw 2.06's exclusion of
Sears from the Visa system harms competi-
tion.[15]

#### 4. Visa's Proposed Screen

Regardless of, and in addition to, the appli-
cability of the two previously-mentioned
screens of market power and economic sense,
Visa argues the court should recognize a new
"screen" applicable to the facts here.

Visa's argument rests upon two general
economic principles. First, Visa stresses the
importance of protecting private property in
a capitalistic market. It asserts that a party
should not be required to deal with its com-
petitor or share its property absent unusual
circumstances. Imposing a duty to deal, it is
argued, harms consumers by destroying in-
centives and innovation. Second, Visa ar-
gues that efficiency-enhancing joint ventures
such as the Visa association should be enti-
tled to special treatment under Section 1 of
the Sherman Act. Such joint ventures, Visa
argues, are beneficial to competition and con-
sumers. The threat of antitrust litigation,
however, discourages the creation of such
ventures. Accordingly, Visa contends, they
should be entitled to special treatment.[16]

These two economic principles, Visa ar-
gues, are so compelling that they warrant
special protection from antitrust scrutiny.
Specifically, Visa asserts that when a joint
venture refuses to deal with a competitor, it
should not be subject to Section 1's Rule of
Reason examination unless the excluded
competitor meets a heightened standard—
showing that it is unable to compete without
the withheld property. When a competitor is
able to compete successfully on its own, it is
argued, there can be no antitrust violation
from refusing to deal with that competitor.
Visa would require that the excluded compet-
itor show that it is unable to compete without
access to the joint venture's property. In
other words, the property must be an "essen-
tial facility" necessary for the success of the
excluded competitor.

A competitor challenging its exclusion
from a joint venture, Visa argues, is not
entitled to a Rule of Reason trial—absent a
showing of essential facilities. When such a
showing is not made, the court should dis-
miss the challenge without submitting it to a
jury. Based on this analysis, Visa seeks "a
'screen' based on economic learning which

15. *See* Part I.B.2. of this Opinion, *infra.*

16. These principles are also important to Visa's
factual argument. Based upon the same eco-

nomic principles, Visa argues that no reasonable
jury could find Visa's conduct to have a substan-
tially harmful effect upon competition.

justifies a legal rule limiting the circumstances in which a duty to deal will be imposed by the antitrust laws[.]" *Visa's Nov. 24, 1992, Memorandum in Support of Motion for Judgment under Rule 50(b)*, at 12. Visa would have the court employ such a screen to declare Bylaw 2.06 "not unreasonable" as a matter of law.[17]

The court will now analyze Visa's economic principles to determine whether, under the antitrust laws, they are sufficient to impose a heightened burden on the plaintiff. The court will then examine Visa's proposed essential facilities standard, to determine when, if ever, such a showing is required as a matter of law.

### a. Private Property: The Right to Refuse to Deal

■ Visa's first economic principle is based on the premise that the right to deal, or to refuse to deal, with whomever one pleases is subject to special protection from antitrust scrutiny. Visa argues that Bylaw 2.06 is nothing more than a refusal to share its property. The bylaw is merely an agreement among Visa members to exercise their right to refuse to deal with a non-member competitor. This type of agreement, it is argued, does not raise traditional Section 1 concerns and should not be subject to complete Section 1 scrutiny.

Visa submits that there is an important distinction between the types of agreements made among the members of a joint venture. On the one hand, there are those agreements which restrict competition *by and among members* of the joint venture. Such agreements place limits on competition within the system and may result in serious restraints of trade. These types of agreements include price fixing, output limitations, and geographic restrictions. On the other hand, there are those agreements which preserve competition between and among members of the joint venture. For example, when members of a joint venture act as a single unit to refuse to deal with a non-member competi-

tor, Visa argues, intrasystem competition is not adversely affected.

Visa asserts that the difference between these types of agreements is crucial. A limit on intrasystem competition is likely to result in a serious restraint of trade, whereas a refusal to deal will not have the same effect. Visa argues that the former is properly suspect under the antitrust laws, while the latter does not raise the same concerns.

Visa stresses that because of the fundamental difference between the two types of agreements, it would be inappropriate to subject them to the same antitrust standard. An agreement to limit competition among venture members, Visa argues, is properly subject to full Rule of Reason scrutiny, while a refusal to deal with a non-member competitor is not. Such a refusal, it is argued, should not be limited by Section 1.

Visa contends that the right to refuse to deal with a competitor is important because it protects private property. Protection of that right from strict antitrust scrutiny is essential to the preservation of incentives in the market. Forcing entities to share their property with competitors, it is argued, is harmful to competition in the long run. If firms know they may be forced to share new products and innovations with their competitors, they will be less likely to undertake the effort and the risk required for the development of new products. Rather, the incentive would be to wait for competitors to create new products, and then enter the market by usurping the competitors' innovations. Compulsory sharing of private property discourages innovation and the creation of new products. Because imposing a duty to deal would "negate incentives in our capitalist society," Visa argues that its right to deal with whomever it chooses should be upheld and respected by the antitrust laws. *Visa's Nov. 24, 1992, Mem.*, at 14.

Visa concedes that the right is not absolute. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601, 105 S.Ct. 2847, 2856, 86 L.Ed.2d 467 (1985), the

---

**17.** It is not entirely clear the extent to which this is a proposal for a new screen or the extent to which it is based on the two previously-mentioned screens of market power and economic sense. In any event, the court recognizes, and Visa concedes, that there is no direct precedent for Visa's argument either in the case law or from the language of the Sherman Act itself.

United States Supreme Court stated: "The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." The Court recognized that although there is a general right to deal, or to refuse to deal, with whomever one pleases, that right is restricted by the antitrust laws.

Visa's position, however, is that the right is restricted only in limited circumstances— when the defendant possesses monopoly power, or when the property is an essential facility for competition in the market. Absent these limited and unusual circumstances, Visa argues, the right to refuse to deal should remain unqualified. Neither of these circumstances is applicable to the present case: Visa does not possess monopoly power, and membership in Visa is not an essential facility for Sears' success in the relevant market. Therefore, Visa argues, a duty to deal may not be imposed and Sears' claim should be dismissed.

Visa stresses that *Aspen* is based on Section 2, rather than Section 1, of the Sherman Act.[18] Section 2 requires that a defendant possess and exercise monopoly power in the relevant market. *See Bright v. Moss Ambulance Serv.*, 824 F.2d 819, 823 (10th Cir.1987) ("The elements of monopolization under Section 2 are 'the possession of monopoly power in the relevant market' and 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966))). Monopoly power is not a requirement under Section 1.

In *Aspen*, a ski resort sued a competitor for violating the monopolization prohibitions of Section 2 of the Sherman Act. 472 U.S. at 595, 105 S.Ct. at 2853. The Court upheld the jury's verdict, finding that the antitrust laws imposed on the defendant a duty to deal with its competitor. *Id.* at 611, 105 S.Ct. at 2861. Visa argues that the duty to deal was im-

posed only because the defendant possessed monopoly power under Section 2. In a Section 1 case, Visa asserts, a duty to deal will not be imposed absent unusual circumstances equivalent to monopoly power.

Again, Visa argues that imposing a duty to deal is harmful to consumers and competition. It stresses that imposing such a duty will negate incentives for investment, innovation, and product-creation. To protect such incentives, Visa argues, "[a] duty to share or deal must be imposed only under very limited conditions—conditions captured in the notions of essentiality or market power of such a degree that it is tantamount to monopoly or deprivation of an input necessary to effective competition." *Visa's Nov. 24, 1992, Mem.*, at 21.

Visa's argument raises legitimate economic policy issues. Visa's legal argument fails, however, because it is not supported by the law—it is contradicted by the language of Section 1 of the Sherman Act and all case law interpreting the Act. The law does not recognize an antitrust exemption for a joint venture's refusal to deal. Such refusals are not insulated from the Rule of Reason examination. All combined activities, whether contracts, conspiracies or combinations, which restrain trade—even simple refusals to deal—are subject to the reasonableness inquiry. Economic concerns cannot change the legal structure of the antitrust laws. Nothing in the Sherman Act itself or in the case law suggests that a refusal to deal by a joint venture such as Visa is limited to Section 2 restrictions, or that such a refusal is entitled to a special protective "screen" from Section 1 scrutiny.

The Supreme Court addressed this issue in the *Aspen* case. The Court did not limit the qualification of the right to deal to Section 2 cases. Rather, the Court noted that the right is also qualified by Section 1, stating that "[u]nder § 1 of the Sherman Act, a business 'generally has a right to deal, or refuse to deal, with whomever it likes, *so long as it does so independently.*'" 472 U.S.

---

**18.** Section 2 provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopo-

lize any part of the trade or commerce ... shall be deemed guilty of a felony....

15 U.S.C.A. § 2 (Supp.1992).

at 601 n. 27, 105 S.Ct. at 2856 n. 27 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (emphasis added)). A firm's right to refuse to deal is unqualified only if it does so independently; a firm which acts in concert with other firms is subject to full Section 1 antitrust scrutiny.[19]

Visa's argument concerning the economic benefits of a joint venture's refusal to deal, as opposed to other joint venture restraints, is not entirely irrelevant to the Section 1 inquiry. In some circumstances, the distinction between the two types of restraints may be important. For example, the distinction may be relevant in the court's determination whether to apply the *per se* illegality presumption. An agreement to limit competition by or among members of the joint venture is more likely to harm competition than is a simple refusal to deal with a competitor. Therefore, intrasystem restraints such as price-fixing or output limitations, are usually struck down as illegal *per se,* whereas simple refusals to deal are more likely to be governed by a complete standard Rule of Reason analysis. *See Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614, 619 (9th Cir. 1979), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); *Fount–Wip, Inc. v. Reddi–Wip, Inc.,* 568 F.2d 1296, 1300 (9th Cir.1978).

Visa's argument is also relevant to the fact-finder. Under the Rule of Reason, the jury may consider all evidence of harmful and beneficial effects. Economic arguments concerning the preservation of private property incentives may be, and in this case certainly were, presented to the jury as evidence of beneficial effects.

Thus, both the court and the jury may consider the economic implications of a refusal to deal. This argument, however, does not alter the legal standard. All restraints imposed by joint action, whether simple refusals to deal or restrictions on competition among the members, are governed by Section 1's Rule of Reason analysis. What Visa gains from its legal argument is an escape from a finding that Bylaw 2.06 is *per se* illegal, not the opposite result of some form of *per se* non-illegality.

This notion is illustrated in several cases. For example, in *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), the Supreme Court struck down a joint venture's refusal to deal as a violation of Section 1 of the Sherman Act based on a Rule of Reason analysis. There, the Court was called upon to consider whether certain bylaws of the Associated Press, a joint venture, constituted an unreasonable restraint of trade. The bylaws "granted AP members powers to impose restrictive conditions upon admission to membership of non-member competitors." 326 U.S. at 6, 65 S.Ct. at 1418. Thus, similar to the present case, the bylaws allowed members to refuse membership to existing competitors. The restriction constituted a refusal to share property with a competitor. The Court determined that the restraint was unreasonable under Section 1.

The Court rejected the defendant's plea for special treatment based on notions of private property. It stated:

> It has been argued that the restrictive By-Laws should be treated as beyond the prohibitions of the Sherman Act, since the owner of the property can choose his asso-

---

**19.** Visa cites *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), as support for its argument. Visa argues: "Applying the standard that properly governs restrictions on competition *by or among members* to a refusal to share property is, in our view, as inappropriate as treating a 'conspiracy' between a parent and its subsidiary as a conspiracy subject to Section 1." *Visa's Oct. 26, 1992, Memorandum in Support of Motion for Judgment Under Rule 50.,* at 10 (emphasis in original).

The court finds no merit in this argument. *Copperweld* offers no support for Visa's position. *Copperweld* stands for the simple proposition that a parent and its subsidiary constitute a single entity for antitrust purposes. 467 U.S. at 777, 104 S.Ct. at 2744. As such, their activities are not governed by Section 1. The Court focused on the distinction between the independent activities of a single entity and the concerted conduct of multiple entities. It found no "joint activity" and therefore Section 1 was not applicable. *Id.* The holding of the case has no application whatsoever to the issue in this case regarding the application of Section 1 to joint venture activity, regardless of the fact that there are different types of agreements among joint venture members.

ciates and can, as to that which he has produced by his own enterprise and sagacity, efforts or ingenuity, decide for himself whether and to whom to sell or not to sell. While it is true in a very general sense that one can dispose of his property as he pleases, he cannot "go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade.";
... The Sherman Act was specifically intended to prohibit independent businesses from becoming "associates" in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete. Victory of a member of such a combination over its business rivals achieved by such collective means cannot consistently with the Sherman Act or with practical, everyday knowledge be attributed to *individual* "enterprise and sagacity"; such hampering of business rivals can only be attributed to that which really makes it possible—the collective power of an unlawful combination. That the object of sale is the creation or product of a man's ingenuity does not alter this principle.

*Associated Press*, 326 U.S. at 14–15, 65 S.Ct. at 1422 (emphasis in original) (citation omitted). The Court did not apply a special "screen" to the refusal to deal, nor did it require a heightened showing of monopoly power or the existence of "essential facilities." [20] Rather, the Court used the Rule of Reason to find the restraint unreasonable.

This case makes it clear that notions of private property and protection of incentives to create are not entitled to special protection from the antitrust laws. Although such notions are important policy considerations and may be important to the factual Rule of

Reason inquiry, they may not be used to avoid antitrust scrutiny.

*Reazin v. Blue Cross & Blue Shield,* 899 F.2d 951 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990), is also instructive on this issue. There, an insurance company, Blue Cross, conspired with two hospitals to injure a third hospital which was affiliated with a competitor. Blue Cross terminated its contract with the third hospital and structured its contract with the other two so as to increase the costs of the third hospital. *Id.* at 954–55. The agreement was challenged as an unreasonable restraint of trade under Section 1. The restraint was submitted to a jury for determination under the Rule of Reason. The jury found a violation of Section 1. *Id.* at 955. On appeal, the Tenth Circuit upheld the jury's findings. *Id.* at 972.

The defendant's conduct in *Reazin* is comparable, although not completely analogous, to Visa's conduct in the present case. Like Visa, Blue Cross's conspiracy constituted an exercise of the right to deal and to refuse to deal. No special standards were applied to the restraint despite the fact that the plaintiff hospital was a viable, thriving competitor. The restraint was struck down because it was found to substantially harm competition. Although *Reazin* involved a vertical restraint of trade, the case supports the proposition that a restraint imposed by a simple refusal to deal is not subject to special treatment, but rather is to be judged by the same standard as all other Section 1 restraints. [21]

 Visa's legal argument must fail for another reason as well—it is not applicable to the facts of this case. Even if the court were to grant special legal deference to a simple refusal to deal, Bylaw 2.06 would not qualify for such special treatment. The court finds, contrary to Visa's position, that

---

**20.** *Associated Press* is often referred to as a so-called "essential facilities" case. As discussed in Part I.A.4.c. of this Opinion, *Associated Press* does not involve a facility that was essential to the existence of the non-Associated Press newspapers as rival, on-going concerns. There is no doubt the facility in question—membership in Associated Press—was very important to the plaintiffs, but it was, strictly speaking, not essential.

**21.** At the December 22, 1992, motion hearing, Visa pointed out that *Reazin* was distinguishable from the instant case, noting that the two would be analogous if Visa had conspired with merchants to deal only with Visa members and not with Discover. The court agrees that *Reazin's* value here is limited to showing that a Rule of Reason analysis is appropriate in Section 1 refusal to deal cases.

Bylaw 2.06 is more than a simple refusal to deal. Rather, as Sears argues, Bylaw 2.06 may also be a restriction on intersystem competition in the general purpose charge card market because it prohibits current Visa members from developing their own proprietary cards.[22]

It is undisputed that Visa intended the restrictions of Bylaw 2.06 to apply to current Visa members as well as non-members.[23] Because of the bylaw, current Visa members who develop successful, competitive proprietary cards are subject to expulsion from the Visa system. Sears argues that this imposes a substantial disincentive for Visa members to develop competing proprietary cards. As such, Visa is not simply refusing to share its property with competitors, it is limiting the way in which its own members may compete within the general purpose charge card market. Such a restriction might be likened to a scheme to fix prices, or to limit output to geographical areas. It is an agreement by multiple entities to limit the way in which they compete with each other. It is true that Visa members compete as to price and output of Visa cards within the system. However, Bylaw 2.06 arguably prohibits, or at least substantially hinders, potential intersystem competition by Visa members who may wish to issue their own proprietary cards.

The disincentive aspect of Bylaw 2.06 is somewhat analogous to the restraint discussed in *North American Soccer League v. National Football League*, 670 F.2d 1249 (2d Cir.), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982). There, the National Football League, a joint venture comprised of professional football teams, enacted a rule forbidding its members from obtaining or retaining ownership of any other professional sports team in any other league. *Id.* at 1250. The rule, while allowing for intrasystem competition within the league, restricted the ability of league members to engage in intersystem competition in the relevant market. The restraint was struck down as a violation of Section 1, pursuant to the Rule of Reason.[24] *Id.* at 1261.

In conclusion, Visa's arguments concerning private property and the right of refusal to deal must fail for two reasons: A joint venture's private property rights are not subject to special legal treatment under the antitrust laws, and Bylaw 2.06 is not a simple refusal to deal.

**22.** Visa argues that Sears lacks standing to make this argument. Because Sears has apparently suffered no injury from the disincentive aspects of Bylaw 2.06, Visa argues that Sears is prohibited from raising this argument to the court or jury. The issue of Sears' standing and injury is discussed in Part I.C. of this Opinion. Sears properly argued the disincentive aspects of Bylaw 2.06 to the court and the jury. Although standing is required to challenge a given restraint, it is not necessary to have standing as to each alleged harmful effect of the restraint. Sears has standing to bring this action because of its exclusion from the Visa system. A party with proper standing may present evidence as to all anticompetitive effects of the challenged restraint, whether or not it has suffered direct antitrust injury flowing from each effect. The question is actually one of admissibility of the evidence, not one of standing. The court found the disincentive evidence to be clearly relevant to the harmful effects issue. The court further found that its probative value was not outweighed by unfair prejudice or any of the other factors set forth in Rule 403 of the Federal Rules of Evidence.

**23.** Although such an interpretation of Bylaw 2.06 is not apparent on its face, Visa has made it clear that the bylaw applies to current members as well as new applicants. Furthermore, after the amendment to Bylaw 2.06 was passed, Visa later amended Bylaw 2.10, to directly prohibit all current Visa members from issuing other proprietary, competitive cards. This issue is discussed further in this court's ruling on Sears' Motion for an Order Enforcing its Rights Under Federal Banking Law. 784 F.Supp. 822, 832–34 (D.Utah 1992).

**24.** Such restrictions often trigger *per se* illegality presumptions. However, as discussed in Part I.A.1.b. of this Opinion, the *per se* presumption may not be proper when the restraint has the potential for legitimate, beneficial effects, or if it is necessary for the product to be available at all. *See North American Soccer*, 670 F.2d at 1259.

Thus, although it could be argued that Bylaw 2.06 is subject to the *per se* illegality presumption, the court has found the presumption is not proper in this case. Visa has presented substantial evidence and argument as to the beneficial aspects of Bylaw 2.06. Accordingly, the reasonableness of the bylaw should be determined by the jury under the Rule of Reason.

Sears has apparently conceded this point. It has not argued for a *per se* illegality declaration by the court. Rather, it agrees with the court's decision to submit the claim to the jury.

### b. Joint Ventures Under the Antitrust Laws

■ The next principle of Visa's legal argument goes to the manner in which joint ventures are treated under the antitrust laws. Visa argues that because of the beneficial aspects of joint ventures, they should be given deferential treatment.

Visa first emphasizes the economic benefits of a joint venture. A "true" joint venture, it is argued, is one in which single firms join together to create products. The combining of efforts gives the joint venture sufficient size and power to accomplish tasks which could not be accomplished by a single firm individually. Thus, it is argued, joint ventures are beneficial to consumers.

Visa also stresses that joint ventures are economically preferable to outright mergers. Members of a joint venture retain their individual identities, and are free to compete between and among themselves. A merger, on the other hand, results in a large, single entity which has no real competition within itself. Thus, a joint venture retains many aspects of competition, whereas an outright merger eliminates all intrasystem competition.

Based on this analysis, Visa submits that "the antitrust laws give joint ventures *more*, not less, leeway than independent entities in their conduct." *Visa's Oct. 26, 1992, Memorandum in Support of Motion for Judgment under Rule 50*, at 11 (emphasis in original) (citing *Broadcast Music, Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979)). Visa asserts that holding joint ventures subject to strong antitrust scrutiny is harmful to consumers. Applying a strict standard to joint ventures, it is argued, discourages the incentive to create joint ventures. This disincentive leaves potentially beneficial projects to be undertaken (if undertaken at all) by smaller, less-efficient single firms, or results in outright mergers which eliminate all com-

petition between the merging firms. *See Visa's Nov. 24, 1992, Mem.*, at 19 n. 16.

Visa asserts that the Visa joint venture is a true, product-creating joint venture in which "its members have come together to create a new product, through risk and innovation, that none of its members could have created individually." *Id.* at 11. Visa's formation as a joint venture, it is argued, has therefore been beneficial to consumers. As such, the activities of the joint venture should receive greater leeway under the antitrust laws.

Visa's argument on this point raises legitimate policy considerations. It sounds logical and well-reasoned. It suffers, however, from one flaw—it is entirely inconsistent with the law. "The theory that a combination of actors can gain exemption from § 1 of the Sherman Act by acting as a 'joint venture' has repeatedly been rejected by the Supreme Court." *North Am. Soccer League v. National Football League*, 670 F.2d 1249, 1257 (2d Cir.), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982). Joint ventures are treated differently from single entities under the antitrust laws based on the very structure of the Sherman Act. "[T]he Act's plain language leaves no doubt that Congress made a purposeful choice to accord different treatment to unilateral and concerted conduct." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 2744, 81 L.Ed.2d 628 (1984).

Section 1 applies only to "contracts, combinations and conspiracies," or in other words, joint activity. It has no effect whatsoever on a single firm that acts alone. A single firm, acting independently, can restrain trade in any manner without violating Section 1. Unless it runs afoul of the monopoly prohibitions of Section 2, it is immune from antitrust scrutiny.[25]

The distinction between Sections 1 and 2 is important. When firms act in concert, they are subject to scrutiny under both sections. *See Copperweld*, 467 U.S. at 774–75, 104 S.Ct. at 2743. Because joint ventures, by

---

25. Section 2, of course, applies to all entities, whether acting alone or in concert. No entity, or group of entities, may act to monopolize or attempt to monopolize without violating Section 2. Thus, the Sherman Act makes a "basic distinction between concerted and independent action." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

their very nature, engage in combined activity, their conduct is continually subject to antitrust scrutiny under Section 1. The law is not unclear in this regard. The United States Supreme Court explains this issue thoroughly in *Copperweld:*

> Any reading of the Sherman Act that remains true to the Act's distinction between unilateral and concerted conduct will necessarily disappoint those who find the distinction arbitrary. It cannot be denied that § 1's focus on concerted behavior leaves a "gap" in the Act's proscription against unreasonable restraints of trade. An unreasonable restraint of trade may be effected not only by two independent firms acting in concert; a single firm may restrain trade to precisely the same extent if it alone possesses the combined market power of those same two firms. Because the Sherman Act does not prohibit unreasonable restraints of trade as such—but only restraints effected by a contract, combination, or conspiracy—it leaves untouched a single firm's anticompetitive conduct (short of threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability.

467 U.S. at 774–75, 104 S.Ct. at 2743–44 (citation omitted).

Regardless of Visa's policy arguments, the simple fact of the matter is that joint ventures are subject to Section 1's Rule of Reason. This is the structure of the Sherman Act. The structure may be arbitrary. It may or may not be economically unsound. It is, however, the law.

This is not to say that a joint venture's status as a legitimate, product-creating venture is not relevant to the Rule of Reason analysis. This argument, similar to Visa's private property argument, may be presented to the jury under the Rule of Reason.[26] The nature and purpose of the joint venture

is highly relevant to the issues of anticompetitive intent and effect.

The argument is also relevant to the court's determination whether to apply *per se* illegality. As discussed in Part I.A.1.b. of this Opinion, under certain circumstances, activities which otherwise would be declared illegal *per se* may be spared the presumption and submitted to a jury for Rule of Reason inquiry. When the restraint has an arguable legitimate purpose or effect, or if the restraint is such that it is necessary for the product to exist at all, *per se* analysis is improper. Joint ventures often escape the *per se* illegality presumption on these grounds. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 296–98, 105 S.Ct. 2613, 2620–21, 86 L.Ed.2d 202 (1985); *NCAA v. Board of Regents of the Univ. of Okla.,* 468 U.S. 85, 100–01, 104 S.Ct. 2948, 2959–60, 82 L.Ed.2d 70 (1984); *Broadcast Music, Inc. v. Columbia Broadcasting Sys.,* 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979); *North Am. Soccer League v. National Football League,* 670 F.2d 1249, 1259 (2d Cir. 1982).

■ Thus, the existence of a joint venture may save an otherwise facially pernicious restraint from *per se* illegality, in favor of a jury's factual Rule of Reason analysis. In this limited respect, joint ventures receive greater leeway than single firms which combine and conspire to restrain trade.

This point is illustrated by *Broadcast Music.* There, a joint venture's price-fixing restraint was such that it ordinarily would have been declared illegal *per se.* The court, however, refused to declare the restraint illegal *per se,* but rather, submitted it to "a more discriminating examination under the rule of reason." 441 U.S. at 24, 99 S.Ct. at 1565. The court found the *per se* presumption improper because the restraint imposed by the

---

**26.** Applying this analysis to the present case, Visa's expert witness, Professor Richard Schmalensee, stated at trial:

> [I]t makes no more economic sense to require Visa to share its property with Discover, because it is an association of 6,000 people, than it would make to require Discover to share its property with others simply because it has

been selfish in some sense and not shared at all. Neither kind of reasoning makes sense. (Tr. at 2275). This is a proper economic factual argument, but it does not reinvent the meaning of Section 1. Unless Discover possesses monopoly power, as a single business it is not required to share its property.

joint venture was necessary for the product to be available at all. *Id.* at 23, 99 S.Ct. at 1564.

Visa's reliance on *Broadcast Music* as support for its legal argument is misplaced. *Broadcast Music* merely stands for the proposition that joint ventures may escape the *per se* presumption. Contrary to Visa's position, there is no special treatment or "screen" given to efficiency-enhancing joint ventures that would justify dismissing Sears' claim as a matter of law.

### c. "Essential Facilities" as a Legal Requirement

■■■ The final aspect of Visa's economic argument is that under the circumstances of this case, a showing of essential facilities is required as a matter of law. Visa asserts that this heightened standard is warranted on the basis of its two economic arguments. When a joint venture does nothing more than to refuse to share its property with a competitor, Visa argues, the excluded competitor has no antitrust claim—absent essential facilities. Accordingly, Visa asserts that for Sears to prevail, it must show that membership in Visa is essential to Sears' existence in the relevant market.

Sears clearly cannot make such a showing. Sears is a successful competitor in the relevant market. It does not need membership in Visa in order to compete in the general purpose charge card market. Through the Discover Card, Sears has shown the ability to compete successfully outside of the Visa system. Visa argues, therefore, that Visa's exclusion of Sears cannot be an antitrust violation and Sears as a matter of law, cannot prevail on its claim.

It is Visa's claim, however, that fails as a matter of law. There is nothing in the antitrust laws which requires Sears to meet a heightened standard of a showing of essential facilities in order to receive a jury trial. A showing of essential facilities is never required as a matter of law. The standard which applies to Sears is exactly the same standard applied to all plaintiffs in Section 1 cases—the plaintiff must show that the restraint substantially harms competition in the relevant market and that it has suffered antitrust injury therefrom. The plaintiff need not show that the restraint destroys its ability to compete. Rather, it need only show that the restraint harms competition and consumers. Because a restraint may substantially harm competition without eliminating the competitor, a plaintiff may prevail under Section 1 without proving essential facilities.[27]

This is not to say that a showing of essential facilities is not relevant under the Rule of Reason. Although essential facilities is not required as a legal matter, it may be extremely important as a factual matter. Certain restraints may be such that they will not be found unreasonable under the antitrust laws unless a showing of essential facilities is made. When a plaintiff is excluded from a facility which is necessary to compete, it is more likely the exclusion is unreasonable. The more essential the facility, the more likely a duty to share will be imposed. The determination, however, is made by the trier-of-fact under the Rule of Reason.

Visa relies on several cases in support of its essential facilities argument. *United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), is the leading so-called "essential facilities" case. There, the defendants, by virtue of their control of several bridges over the Mississippi River, controlled every reasonable means of railway access into and out of the city of St. Louis. The United States brought suit under the Sherman Act to compel defendants to share access to the bridges with their competitors. Those excluded from use of the bridges were effectively shut out of the market. Thus, defendants controlled an essential facility for competition in the market. *Id.* at 397, 32 S.Ct. at 510. The Court imposed a duty to share access to the bridges, based upon both Sections 1 and 2 of the Sherman Act. Because railway access was essential for competition, the Court held that the exclusion of competitors constituted a

**27.** Of course, the plaintiff must establish that it has suffered antitrust injury from the restraint. This does not require, however, a showing of inability to compete. A showing of negative impact on the ability to compete is sufficient.

combination in unreasonable restraint of trade. *Id.* at 411–12, 32 S.Ct. at 516.

This holding, however, does not support Visa's position. The case stands for the simple proposition that the existence of essential facilities may result in the imposition of a duty to deal. This does not mean, however, that a showing of essential facilities is required before a duty to deal will be imposed.

Similarly, in *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), newspapers excluded from membership in the Associated Press sought access to the association. The exclusion from membership caused the excluded parties to suffer harm, "hindered and impeded the growth of competing newspapers," and set excluded parties at a "competitive disadvantage." *Id.* at 12, 18, 65 S.Ct. at 1420, 1423. It did not, however, destroy their ability to compete. Many of the excluded newspapers had been and were able to compete in the market without membership in the Associated Press system. Thus, membership was not "essential," and certainly not as important as the bridges at issue in *Terminal Railroad.*

Despite the fact that membership in Associated Press was not "essential," the exclusion was struck down as a violation of Section 1. As in *Terminal Railroad,* the importance of the facility in *Associated Press* was a major, if not the controlling, factor in the fact-finder's determination that the defendants' joint agreement was an unreasonable restraint of trade. Neither case, however, stands for the proposition that without a showing of essential facilities, a plaintiff's case must be dismissed as a matter of law.

Many antitrust refusal to deal cases brought under Section 1 are maintained by plaintiffs who are viable competitors in the relevant market. In *Reazin v. Blue Cross & Blue Shield,* 899 F.2d 951 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990), a competing hospital was successful in its Section 1 claim, even though it had been, and continued to be, a successful competitor in the relevant market. Therefore, a contract with Blue Cross was not an essential facility necessary for the hospital to successfully compete. In *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 296–98, 105 S.Ct. 2613, 2620–21, 86 L.Ed.2d 202 (1985), the plaintiff was a viable competitor and no essential facilities were established, yet its Section 1 suit was allowed to proceed. *See also FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 455–56, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986) (dentists' refusal to cooperate with insurers' request for X-rays did not involve essential facilities but did withhold particular desirable service from customers); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 30, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984) (anesthesiologist bringing Section 1 action a viable competitor); *Rickards v. Canine Eye Registration Found.,* 783 F.2d 1329, 1332–33 (9th Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 180, 93 L.Ed.2d 115 (1986) (veterinarians bringing counterclaim did not possess dominance in the relevant market nor did they control an essential facility).

The case law indicates that a showing of essential facilities is not required for a plaintiff to prevail under Section 1. Visa has failed to show any reason for the imposition of a higher standard for Sears' exclusion. The exclusion, therefore, was properly tried to the jury under the Rule of Reason.

### d. Summary and Conclusion of Visa's Economic Legal Argument

In summary, the economic principles upon which Visa relies do not support its argument for judgment as a matter of law. There are no legal principles granting antitrust immunity to a joint venture for its refusal to share its property. Such a refusal is subject to the same standard which governs other combinations in restraint of trade—Section 1's Rule of Reason.

These economic arguments may be highly relevant to the reasonableness inquiry. They may be strong and persuasive evidence of the lack of anticompetitive effects. The jury is free to consider such evidence when weighing the benefits and harms of a given restraint.[28] If a refusal to deal actually ben-

---

28. In the present case, Visa presented its economic arguments to the jury in considerable de-

tail. The jury presumably considered all of

efits, rather than harms, competition, it will presumably be upheld by the jury's verdict.

Visa submits that such a system is poor economic policy. Imposing joint venture conduct to a jury's Section 1 scrutiny, it is argued, harms consumers and competition. Every action undertaken by a joint venture is potentially subject to a Section 1 challenge. The defense of such a challenge can be very costly—especially when a jury trial is involved. Under the present system, unless a shorthand presumption is used to dismiss the claim, the case must go to trial. An antitrust defendant, even if eventually successful, must expend significant time and resources in defending against the claim.

According to Visa, this threat of antitrust litigation acts as a disincentive to the creation of joint ventures. No matter how beneficial a joint venture may be, firms will be hesitant to combine for fear of exposure to antitrust liability. Unless Visa's legal arguments are adopted and joint ventures such as Visa are shielded from Rule of Reason jury trials, Visa argues, consumers will be deprived of the benefits which otherwise could have been achieved through the pooling of efforts in joint ventures.

The court recognizes that such a system may or may not produce detrimental effects. However, such is the present legal system imposed by the Sherman Act. The determination of policy was made in 1890 by the United States Congress when it enacted the Sherman Act. Congress determined that concerted action in restraint of trade would be subject to antitrust scrutiny. It provided that challenged restraints will be subject to litigation. It made no exceptions for joint ventures, or for refusals to deal.

Visa's arguments would shield potentially anti-competitive behavior from antitrust scrutiny. Such arguments are not properly made to the court. Policy arguments may not be used to contradict or alter the law. As explained by the United States Supreme Court:

> The early cases also foreclose the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition. That kind of argument is properly addressed to Congress and may justify an exemption from the statute for specific industries, but it is not permitted by the Rule of Reason.

*National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 689–90, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978) (footnote and citations omitted). Policy arguments, no matter how persuasive, which seek to shield concerted conduct from antitrust scrutiny are of no practical effect when addressed to the court as the grounds for dismissal as a matter of law.

Visa's policy arguments should be directed to Congress rather than the court. It is not the role of this court to alter the law in order to establish what the court may or may not feel is "proper" economic policy. If the structure of Section 1 is arbitrary, unfair, or harmful to consumers, changes should be made by Congress through exemption, amendment, or repeal. "[W]hen Congress has desired to permit cooperatives to interfere with the competitive system of business, it has done so expressly by legislation." *Associated Press v. United States*, 326 U.S. 1, 14, 65 S.Ct. 1416, 1421–22, 89 L.Ed. 2013 (1945). It is not the province of the judicial branch to alter the law as established by Congress.[29]

Visa's arguments when making its determination of the unreasonableness of Bylaw 2.06.

**29.** At trial, Visa's expert witness, Professor Richard Schmalensee, stated he had been involved in drafting a legislative proposal aimed at joint ventures created for the purpose of research and development. (*See* Tr. at 2276–78). This proposal addressed an antitrust exemption to allow separate companies to pool their efforts into research and development joint ventures, thereby obtaining greater efficiencies, without the constant threat of being declared illegal *per se*. This

exemption from the antitrust laws was sought from the legislative branch, not the judiciary.

Arguments made to Congress in favor of the exemption were similar to those Visa makes here: every joint research and development effort by two or more firms, no matter how desirable for competition and consumers, was subject to a Section 1 lawsuit and a possible finding of *per se* illegality. Competitors not involved in the joint research and development venture, therefore, had every incentive to file such a suit. It was asserted that this threat of litigation and *per se* illegality was hindering American progress,

In conclusion, Visa's economic arguments were properly made to the jury under the Rule of Reason. They may be properly raised before Congress in considering new legislation. They are not, however, based upon current law, sufficient to support judgment in Visa's favor as a matter of law.

## B. Visa's "Factual Argument"

Having rejected Visa's legal argument for judgment as a matter of law, the court now turns to Visa's factual argument. This argument is slightly different in nature from the legal argument, but it is based on essentially the same facts. Visa asserts that the facts of this case are so lacking that no reasonable jury could have returned a verdict in support of Sears' Section 1 claim.

At the outset, the court acknowledges that its view of the evidence differs from the jury's findings. If the court had been the fact-finder under Sears' Sherman Act claim, it would most likely not have concluded that keeping Sears out of the Visa system substantially harms competition in the relevant market. In fact, the court would have concluded that the harm to competition from letting Sears into the Visa system is greater than any harm from keeping Sears out. If it had been the fact-finder, the court would have been inclined to find no net harm to competition from Bylaw 2.06.

The court feels this acknowledgement is helpful and appropriate under the unique circumstances of this case. Visa's Clayton Act counterclaim was tried to the court in equity. Accordingly, the court was required to conduct a thorough factual review of the relevant market. In that regard, the court as a fact-finder was obligated to determine whether allowing Sears, the owner of the Discover Card, to also be a Visa member may substantially lessen competition in the relevant market within the meaning of Section 7 of the Clayton Act. The court's factual inquiry involved consideration of all the relevant economic and policy issues considered by the jury in connection with Sears' Sherman Act claim. As a result, the court's inquiry on the Clayton Act counterclaim is in significant respects the opposite of the jury's inquiry on the Sherman Act claim. Whereas the jury was asked to determine whether it violated the Sherman Act for Visa to keep Sears out, the court was asked whether it violated the Clayton Act to let Sears in. Accordingly, hereafter in Part II of this Opinion, the court performs its Clayton Act fact-finding role. Its factual conclusions are identical to those it gratuitously expresses here. The one and only reason the court does so at this point is to emphasize and strengthen the court's decision that notwithstanding the factual attitude of the trial judge, Sears' evidence as to the Sherman Act was reasonable, credible and capable of supporting the verdict reached by the jury.

Specifically, as explained more fully in its Clayton Act discussion, the court believes that Bylaw 2.06 fosters intersystem competition in the relevant market. Such competition is important in the general purpose charge card market, with only five active intersystem competitors (Visa, MasterCard, American Express, Discover, and Diners Club/Carte Blanche). Simply adding another high-priced card issuer, as Sears has always been with both the Discover Card and the Sears charge card,[30] to the Visa system will not solve the problem. It may provide short-term intrasystem competitive benefits within the Visa system, but in the long run, in the court's judgment, the damages from such

---

and was one reason America was lagging behind other countries in certain economic respects. The proponents of the proposed bill argued that without the threat of *per se* illegality, more American firms would combine money and talent for joint research and development projects. S.Rep. No. 427, 98th Cong., 2d Sess. 1 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3105.

The result of this effort was passage of the National Cooperative Research Act of 1984. 15 U.S.C.A. § 4301 et seq. (Supp.1983 to 1991). It took an exemption specifically enacted by Congress to achieve the desired antitrust relief in the research and development area. No court has the power to grant such an antitrust exemption.

**30.** The evidence showed that as of the time of trial, the Discover Card had never charged less than a 19.8% annual percentage rate, the only general purpose charge card never to have charged a lower rate. The Sears Charge card used at Sears retail stores has historically charged an annual percentage rate of approximately 21%.

inclusion will outstrip the benefits. Eventually, consumers will be left with one more top-ten Visa issuer charging relatively high interest rates and a Visa/MasterCard system which will dominate the general purpose charge card field to an even greater extent than it does today.

In addition, the court found Visa's policy and economic arguments to be the more compelling. As a factual matter, the court found persuasive Visa's positions regarding the need to protect joint venture innovation, the importance of protecting private property, and the economic and competitive consequences of keeping the owner of the Discover Card out of the Visa system. The court found Visa's expert witness, Professor Richard Schmalensee, more compelling than Sears' expert witness, Professor James Kearl, and was persuaded by Visa's industry expert, Mr. Robert McKinley. Visa's general counsel, Mr. Bennett Katz, provided what the court felt was helpful and persuasive evidence regarding the various business reasons why Visa preferred to keep Sears out of the Visa system.[31] The court does not see the proposed Prime Option Visa card as the low-cost boon to consumers that it is touted to be. In short, the court does not see the facts Sears' way.

The court's factual attitude, however, does not require an overturning of the jury's findings as a matter of law. The fact that the court may have ruled differently than the jury on the Sherman Act does not warrant the granting of Visa's Rule 50(b) Motion for Judgment as a Matter of Law. It would be inappropriate for the court to wrongly " 'substitute its judgment for that of the jury.' " *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1400 (10th Cir.1988) (quoting *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1171 (10th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985)).

The standard to be applied by the court under Rule 50(b) is not based upon the court's factual findings. Rather, the standard is whether "there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the non-moving] party with respect to that issue." Fed.R.Civ.P. 50. A judgment as a matter of law is "appropriate only when 'the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made.' " *Prudential Federal*, 763 F.2d at 1171 (quoting *Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir.1974)). It is clear from the case law in this circuit that in analyzing a Rule 50(b) motion, the court is "obligated to view 'evidence and inferences most favorably to the nonmoving party' ". *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991) (quoting *Zimmerman v. First Fed. Sav. & Loan Ass'n*, 848 F.2d 1047, 1051 (10th Cir.1988)). "[T]he court must view the evidence and indulge all inferences in favor of the party opposing the motion and 'cannot weigh the evidence, consider the credibility of witnesses or substitute its judgment for that of the jury.' " *Lucas*, 857 F.2d at 1400 (quoting *Prudential Federal*, 763 F.2d at 1171). Judgment as a matter of law is appropriate if the court finds no reasonable evidence to support the verdict or if "the verdict is supported only by sheer speculation and conjecture." *Ware v. Unified Sch. Dist. 492*, 881 F.2d 906, 911 (10th Cir.1989), *modified*, 902 F.2d 815 (10th Cir.1990).

### 1. Market Power

The court has previously determined that the evidence was sufficient to support a finding that Visa members *possess* market power in the relevant market.[32] Pursuant to the

---

**31.** Regardless of the intent and motivation of Visa's member banks in passing Bylaw 2.06, Mr. Katz, as Visa's chief legal officer, expressed concern about government regulation if Visa were to grow significantly larger. Mr. Katz explained that if Sears were to become a Visa member and as a result the Discover Card became less of a competitive force, the federal government may well impose more intrusive regulations on the Visa association or even require a dissolution or break-up of some kind. It is a credible concern for a business in our free enterprise system to worry about being run by the government, whether through the enactment of legislative controls, executive branch administration, or perhaps worst of all, judicial branch scrutiny and approval of its every move.

**32.** *See* Part I.A.2. of this Opinion, *supra*.

court's instructions, the jury determined that Visa members collectively possessed market power and that the enforcement of Bylaw 2.06 constituted an exercise of that market power. Visa argues that the jury erred in this finding. It submits that no reasonable jury could find, from the evidence presented at trial, that Bylaw 2.06 is an exercise of market power.

Visa argues that Bylaw 2.06 is an action by the Visa members in their individual, rather than collective, capacities. Because the Visa system includes approximately 6000 members, Visa argues, no one single member has the ability to exercise market power. Therefore, Visa submits, it is only through collective action that Visa members would be able to exercise market power. Visa asserts that Bylaw 2.06 is not collective action because it allows Visa members to continue to compete individually between and among themselves as to price and output. Visa explains that unless its "members pass rules limiting price or output among themselves, their ability to exercise market power remains a function of their *individual* market shares...." *Visa's Nov. 24, 1992, Mem.*, at 36 (emphasis in original). In other words, Visa submits that only restraints on trade between and among members of the joint venture may constitute an exercise of collective market power.

Sears argues, on the other hand, that Bylaw 2.06 is a collective exercise of market power. Sears asserts that although the bylaw does not expressly restrict competition as to price or output between and among Visa members, it does so indirectly. By excluding a large, low-cost competitor such as Prime Option from the Visa system, the bylaw shields current Visa members from vigorous competition. Although there is competition among the current members, Sears argues that competition is not as strong as it could be. This situation, Sears argues, allows the large banks to maintain high prices and profits at the expense of the consumer. Therefore, Sears claims, Bylaw 2.06 is a collective effort by Visa members to limit competition within the system.

This assertion was supported by evidence at trial. Sears offered the testimony of its expert witness, Professor Kearl, who testi-

fied that the 72% combined market share held by Visa and MasterCard is important in determining that Visa members have market power and are able to exercise that power through association rule-making. Professor Kearl further testified that because the collective rule-making directly affects such a large share of the market, Visa members have significant incentive and ability to keep interest rates and profits high. In addition, he asserted that the presence of proprietary cards such as the Discover Card has not stopped Visa members from exercising their collective rule-making power to the detriment of consumers. Professor Kearl testified that further evidence of Visa's market power is the fact that Visa members, especially its top-ten issuers, have continuously enjoyed high profits for many years.

■ Visa claims that Sears' evidence was insufficient and no reasonable jury could have based a verdict on this evidence. First, Visa attacks the qualifications of Professor Kearl, claiming that he lacks the education and experience to be credible as an expert witness in this particular area of economics. The court finds this argument to be untimely and without merit. Visa failed to challenge Professor Kearl's qualifications during the trial. He was allowed to give his opinions without objection by Visa. Visa also subjected him to thorough cross-examination. Once an expert is qualified, especially without objection, it is not the province of this court to judge the witness's credibility or to determine which expert should be believed. "It remains the duty of the jury to evaluate the testimony of expert witnesses, just as all other witnesses, and to reach conclusions as to its worth and weight. Our entire system is anchored to the jurors' determination of credibility of witnesses and the weight to be given their testimony." *Moe v. Avions Marcel Dassault–Brequet Aviation*, 727 F.2d 917, 929–30 (10th Cir.), *cert. denied*, 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984). With no objection at trial as to Professor Kearl's qualifications as an expert, this court will not now step into the jury's domain and disregard or exclude his testimony.

■ Visa next attacks the findings and conclusions made by Professor Kearl. Visa

asserts that Professor Kearl's testimony regarding collective rule-making and the appropriateness of aggregating the shares of Visa and MasterCard members is incorrect. Visa relies on the testimony of its own expert, Professor Schmalensee, who stated that Bylaw 2.06 is not an exercise of market power by the Visa members.

Under Rule 50(b), the court must determine whether the testimony presented by Professor Kearl and the other evidence presented by Sears was such that a reasonable jury could have relied on it in finding an exercise of market power by Visa. The court concludes that the jury could have so found. It was not unreasonable for the jury to believe Professor Kearl's testimony and to conclude that in the aggregate, Visa members possessed and exercised market power. His testimony regarding the collective rule-making power of Visa members and the presence of high profits is supported by evidence that the largest members of Visa have been very slow in responding to price competition from smaller Visa members and new entrants. This testimony was supported by Mr. McKinley, Visa's own industry expert, who acknowledged that the large Visa and MasterCard issuers continue to charge high interest rates even though many smaller issuers, such as locally-owned savings and loan associations, have lowered their interest rates significantly. All of this evidence could have persuaded the jury that Visa members possessed and exercised market power in passing Bylaw 2.06.

### 2. Harmful Effects

▪ Visa attacks the jury's finding that Bylaw 2.06 has substantially harmful effects on competition. Visa claims that based on the evidence presented at trial, no reasonable jury could have so concluded. As explained in the Background section of this Opinion, Sears presented evidence that Bylaw 2.06 harms competition by preventing Sears' low-cost Prime Option Visa card from entering the market, and by creating a disincentive for the creation of new proprietary cards.

Visa attacks Sears' disincentive evidence by asserting that it is based merely on speculation. Visa asserts that there is no direct evidence suggesting that Bylaw 2.06 has deterred anyone from offering a new general purpose charge card. The court does not agree.

First, this is a common sense argument. Evidence showed that a Visa membership can be highly profitable. It is reasonable to argue that no firm will enter the general purpose charge card market with a new proprietary card if it risks losing its Visa membership. This common sense conclusion was supported by specific evidence presented at trial. Dean Witter's President, Phillip Purcell, testified that Sears would not have developed its proprietary Discover Card had it known that such a move would disqualify it for membership in Visa. The evidence also showed that no entity has created a new proprietary card since the passage of Bylaw 2.06. In contrast, during the same period, many entities have joined the Visa and MasterCard systems. Finally, Visa's own internally-prepared document lists no fewer than twenty-one Visa members whom Visa views as potential competitors with the capacity to issue their own proprietary cards. (Pl.'s Ex. 297). Based on this evidence, the court finds that a reasonable jury could have found harmful effects on competition based on Sears' disincentive evidence.

▪ Next, Visa argues that the evidence was insufficient to support a finding that excluding Sears' Prime Option Visa card from the market had a harmful effect on competition. Visa asserts that because competition is vigorous between the 6000 Visa members, the exclusion of one more member in the association is insignificant. Again, the court does not agree that Visa's argument was so compelling that a reasonable argument to the contrary was not possible.

Sears presented evidence that the addition of Prime Option Visa to the Visa system would be substantially beneficial to competition. There was testimony that Prime Option would be a low-cost card [33] which would

---

**33.** At the time of trial, Prime Option Visa's terms anticipated a 25–day grace period for all card holders, a 9.9% rate of interest on the current

and the previous month's purchases and a rate of 9.9% plus the Prime Rate on older purchases. In addition, there is no annual fee, a periodic

be supported by powerful marketing and advertising strategies on a national level. While smaller Visa issuers may offer lower interest rates, such firms do not have the marketing muscle of Sears. Furthermore, while most of the top-ten Visa issuers provide lower-cost cards to some of their customers, Prime Option's favorable terms would be available to all of its customers. Based on such evidence, it was not unreasonable for the jury to find that the exclusion of Sears was harmful to competition.

### 3. Beneficial Effects

■ Visa has enumerated various beneficial effects it claims Bylaw 2.06 has on competition. This argument is essentially identical to Visa's previous legal argument based on economic principles and policies. First, Visa asserts that Bylaw 2.06 should be upheld because the protection of property rights is essential to encourage innovation and risk-taking in business. Second, Visa argues that the protection of incentives for the creation and maintenance of joint venture property is also a reason to uphold Bylaw 2.06. Given these compelling policy considerations, Visa claims no reasonable jury could have concluded that the harmful effects of Bylaw 2.06 substantially outweigh the beneficial effects.

Just as the court rejected Visa's legal argument on this point, it rejects the assertion that Visa's policy arguments are so compelling that no reasonable fact-finder could have found to the contrary. As a factual matter, the jury did not accept Visa's arguments as dispositive. The court does not know whether the jurors simply discredited the evidence presented on these issues or whether they found that the benefits to competition were outweighed by the harmful effects. In either case, however, it was the jury's prerogative to weigh the evidence.

Visa also argues that an additional benefit to competition from Bylaw 2.06 is the preservation of competition at the intersystem level. Visa argues that the intersystem market is already highly concentrated with only five system-level competitors: Visa, MasterCard, Discover, American Express and Diners Club/Carte Blanche. If Sears were to join the Visa system, Visa argues that competition between Discover and Visa will decrease, thereby affecting competition on the intersystem level.

Visa points out that as a result of duality, there is no significant intersystem competition between Visa and MasterCard. Visa argues that this lack of competition is indicative of what will happen to competition between Discover and Visa if Sears is allowed to issue Prime Option. Visa attempted to articulate this point at trial, presenting evidence regarding the effects of duality and the possibility of a similar occurrence if Sears were allowed to become a member of Visa.

Visa also claims that the Discover Card will be less viable as an intersystem competitor for various other reasons. Witnesses explained how they feared Sears would put less time and money into improving Discover, and that Discover's top executives would be reassigned to Prime Option Visa. In addition, testimony was offered to suggest that Sears, as a Visa member, may choose to implement new and improved features with Prime Option Visa but not with the Discover Card. Any or all of these possibilities, Visa claims, will eventually lead to the demise of the Discover Card, thereby decreasing competition on the intersystem level.

Sears presented evidence to contradict Visa's assertions. Most important was testimony supporting Sears' contention that the Discover Card would continue to be a viable competitor in the general purpose charge card market. First, Sears asserted that Visa's duality analogy was inappropriate because Prime Option Visa was designed to reach that part of the market that Discover does not reach.[34] Furthermore, Sears

---

skip-a-payment, and a standard opening credit line of $3500.

**34.** Sears presented credible evidence that the Discover Card has more appeal to persons who tend to promptly pay their credit card balances, referred to in the industry as "transactors," than

it has to persons who carry credit card balances from month to month, referred to in the industry as "revolvers." Visa and MasterCard are used primarily by revolvers. Prime Option Visa is designed to appeal to revolvers, rather than

claimed that it had no desire to convert Discover to a Visa card because Discover has been, and continues to be, a very successful, money-making venture.

In assessing each of Visa's arguments concerning the competitive benefits of Bylaw 2.06, the court concludes that a reasonable jury could have determined that the harmful effects on competition substantially outweigh any beneficial effects. The court cannot find, as a matter of law, that the jury erred in making its determination.[35]

### 4. Antitrust Injury

■ Visa asserts that Sears has not suffered any antitrust injury as a result of Bylaw 2.06. First, Visa argues that Sears has not been injured because Sears' inability to issue a Prime Option Visa card has not prevented Sears from competing in the market generally. In addition, Visa asserts that Sears is capable of offering a card with Prime Option's features as a different version of the Discover Card or as an independent proprietary card. Visa contends that the only "benefit" Sears has been denied is that Sears is unable to capitalize on the value attributable to Visa's trademarks, systems, and merchant base.

Sears argues, on the other hand, that it suffered antitrust injury as a result of Bylaw 2.06, regardless of its decision not to launch Prime Option independent from the Visa system. At trial, Sears presented evidence that issuing Prime Option as a separate proprietary card would not have been as profitable as issuing a Prime Option Visa. Sears argues that the most effective business plan was to pursue its multi-card strategy—issuing Discover as a proprietary card, and Prime Option as a Visa card. Mr. Purcell, president of Dean Witter, testified that if he had known Visa would change its rules not to allow Sears to issue both a national proprietary card and a national Visa card, he would not have supported the idea to issue Discover

first and then issue a Visa card or Master-Card card.

The court finds that Sears presented sufficient evidence at trial from which a reasonable jury could find that Sears suffered antitrust injury as a result of Bylaw 2.06. The fact that Sears could have perhaps reduced its injury by issuing Prime Option outside the Visa system does not mean it suffered no antitrust injury. If Visa's action resulted in a restraint of trade, it is not a defense to argue that no injury would have resulted if Sears had simply decided not to challenge the bylaw and instead issued Prime Option independently. *See Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 754 F.Supp. 1336 (N.D.Ill.1991), *aff'd*, 961 F.2d 667 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992) (trial court held that when restraint of trade is found, it is no defense if injury could have been avoided by signing a different contract or striking a different bargain).

The evidence at trial indicates that Sears would benefit significantly from issuing Prime Option Visa as opposed to Prime Option Discover or another separate proprietary card. Sears presented sufficient evidence for the jury to determine that Sears was injured because it was prevented from issuing the Prime Option Visa card.

Based on the foregoing the court finds that the jury could have reasonably found that Bylaw 2.06 is an unreasonable restraint of trade in the general purpose charge card market and that Sears suffered antitrust injury as a result. Visa's factual argument based on Rule 50(b) is denied.

### C. Sears' Disincentive Evidence: Standing & Injury

■ In an argument somewhat related to the injury issue discussed in the foregoing section, Visa asserts that the court erred in allowing Sears to present its disincentive evidence to the jury. Visa submits that Sears

---

transactors, and in that sense is not expected to be in direct competition with the Discover Card.

**35.** Again, the court notes that it was possible that the jury found all of Visa's arguments concerning

intersystem competition persuasive. However, the jury may still have concluded that the harms to competition substantially outweighed the benefits.

suffered no injury from the alleged disincentive aspects of Bylaw 2.06, and therefore lacked standing to present such evidence.

The court agrees that the disincentive argument apparently does not apply to Sears. Sears argued that Bylaw 2.06 acts as a disincentive to the creation of new proprietary cards by threatening exclusion or expulsion from the Visa system. Sears presumably did not suffer any antitrust injury from Bylaw 2.06's disincentive effects. Because Sears is already excluded from membership in Visa, there can be no realistic disincentive for Sears to create additional proprietary cards.[36] This does not mean, however, that the admission of the disincentive evidence was improper. The disincentive evidence, although irrelevant to the question of antitrust injury, is relevant to the jury's Rule of Reason inquiry regarding the anticompetitive effects of Bylaw 2.06.

■ Sears had standing to bring its Section 1 claim against Visa on the basis of its allegation that it was wrongfully excluded from Visa membership. When a plaintiff has established standing to challenge a restraint, it may present relevant evidence as to all anticompetitive effects of the restraint in the relevant market. It is not limited to those effects which directly affect the plaintiff.

■ The question of antitrust injury, of course, is a separate inquiry. If the fact-finder determines that a restraint of trade is unreasonable, it must then determine whether there is sufficient evidence to find that the plaintiff suffered antitrust injury as a result of the unreasonable restraint. This inquiry is properly limited to evidence relevant to the plaintiff's alleged injury.

Visa's argument confuses the issue of standing with admissibility of evidence. All evidence of anticompetitive effect is relevant to the Rule of Reason examination. The fact that such evidence is not relevant to the injury inquiry does not render it inadmissible, unless it is unfairly prejudicial or otherwise objectionable under Rule 403 of the Federal Rules of Evidence. In this case, no such objection was warranted. Accordingly, Sears' evidence of the disincentive aspects of Bylaw 2.06 was properly admitted as evidence of the bylaw's effect on competition in the relevant market.

Visa argues, however, that such a holding allows Sears to "mix and match" its claims—it allows Sears to prove an antitrust violation based solely on its disincentive evidence, while proving injury based on its exclusion from the Visa system. *Visa's Nov. 24, 1992, Mem.,* at 54–55. Such a result, however, was precluded by the court's instructions to the jury.[37] These instructions, together with the special verdict form, made it clear that the question of injury is a separate inquiry from

**36.** It is conceivable that Sears could argue that it was affected by the disincentive aspects of Bylaw 2.06 because Sears would choose membership in Visa over continuing to operate the Discover Card, but Sears offered no evidence to support such an argument.

**37.** The jury was instructed on the issue of injury as follows:

If you determine that Visa has unreasonably restrained trade in the relevant market, you must next determine whether Sears was injured by Visa's actions. Proving injury does not require Sears to prove a dollar amount, but only that Sears was in fact injured by Visa's alleged restraint of trade. It is important to understand that injury and the amount of damages are different concepts. In this trial, you will not be determining the amount of damages, if any, suffered by Sears.

To establish injury, Sears must have offered evidence which establishes as a matter of fact and with a fair degree of certainty that Visa's alleged illegal conduct was a material cause of Sears' injury. This means that Sears must

have proved that some injury flowed to it as a result of Visa's alleged restraint of trade. If the injury would be merely incidental or inconsequential, or if Visa's antitrust acts would be so removed from the injury as to be only remotely causative, then Sears would not be injured by reason of anything forbidden in the antitrust laws. Sears is not required to prove that Visa's alleged restraint of trade was the sole cause of its injury; nor need Sears eliminate all other possible causes of injury to establish causation. It is enough if Sears has proved that the alleged restraint of trade was a material cause of its injury. However, if you find that Sears' injury was caused by something other than the alleged restraint of trade, then you must find that Sears has failed to prove the fact of injury.

Jury Instruction 24. It is assumed that the jury followed this explicit instruction and based its answer to the question regarding antitrust injury on a finding that Sears suffered antitrust injury as a result of Visa's antitrust violation.

the reasonableness determination. The jury was instructed that Sears carried the burden of proof as to each issue, and that each inquiry must be supported by the evidence. The jury was instructed that Sears' alleged injury must flow from the antitrust violation. This precluded a "mix and match" verdict.

The court has found that evidence of the exclusion of Prime Option Visa from the market was sufficient to support a finding of antitrust injury. It follows, therefore, that the jury's finding of antitrust injury rested on this argument. It also follows that the jury's finding of substantial harm to competition rested, at least in part, on this same argument. The court's instruction informed the jury that Sears' injury must be the result of the alleged antitrust violation. If the jury's finding of violation rested solely on Sears' disincentive evidence, it would not (and could not) have found that Sears suffered antitrust injury. Implicit in the jury's finding of antitrust injury is a finding that

the exclusion of Sears from Visa contributed to the substantial harm to competition.[38]

## II. THE CLAYTON ACT COUNTERCLAIM

The court now turns its attention to Visa's Counterclaim. The Counterclaim was tried in equity to the court based on the same evidence presented at trial relevant to Sears' Sherman Act claim. In its Counterclaim, Visa seeks an injunction under Section 16 of the Clayton Act to prevent Sears from attaining Visa membership. This request for injunctive relief is based on Visa's assertion that Sears' entry into the Visa joint venture as a member-owner would violate Section 7 of the Clayton Act. Section 7 prohibits any person engaged in commerce from acquiring the stock or assets of another when "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C.A. § 18 (Supp. 1992).[39] "The entire range of corporate

---

**38.** Visa argues that a new trial may be required "since it is impossible to tell from the jury's verdict whether their respective determinations of illegality and fact of injury were predicated on one claim rather than the other...." *Visa's Nov. 24, 1992, Mem.,* at 55 n. 53.

This argument was reiterated by Visa in a letter dated January 27, 1993. There, Visa submitted to the court a recently decided United States Supreme Court case, *Spectrum Sports, Inc. v. McQuillan,* — U.S. —, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Visa asserts that this ruling supports the proposition that "a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury." *Syufy Enters. v. American Multicinema, Inc.,* 793 F.2d 990, 1001 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). In *Spectrum Sports,* the jury found the defendant liable under Section 2 of the Sherman Act, but it was unclear whether the jury based its decision on a finding of monopolization, conspiracy to monopolize or attempted monopolization. Because there was insufficient factual evidence to support a finding of attempted monopolization and it was possible that the jury rested its decision regarding liability on that theory alone, the Supreme Court held that the case had to be retried. In the instant case Visa argues that because the jury verdict with respect to injury does not indicate what evidence was the basis of the jury's decision, the verdict must be set aside.

Visa's argument and the holding of *Spectrum Sports,* however, have nothing to do with the present case. Here, it is not impossible to tell upon what evidence the jury relied in making its

determination of injury. As discussed above, Sears' exclusion evidence was the basis for the jury's finding of antitrust injury. Likewise, this evidence was necessarily relied upon, at least in part, in finding the restraint to be unreasonable. *Spectrum Sports* stands for the simple proposition that if one theory upon which a verdict of liability may have been based was improperly submitted to the fact-finder, the case must be retried. That is obvious because the verdict may rest on an impermissible legal standard. But such a concept has no application whatsoever in this case in which all evidence of liability (both disincentive evidence and Sears' exclusion evidence) was properly admitted, and in which the jury was properly instructed that Sears' injury must flow directly from the anticompetitive restraint. In *Spectrum Sports* an improper theory was submitted to the jury. No such submission occurred here.

**39.** The statute provides, in pertinent part:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C.A. § 18 (Supp.1992).

amalgamations, from pure stock acquisitions to pure assets acquisitions," are "within the scope of § 7." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 342, 83 S.Ct. 1715, 1730, 10 L.Ed.2d 915 (1963).

The purpose of Section 7 is "to arrest incipient threats to competition which the Sherman Act did not ordinarily reach." *United States v. Penn–Olin Chem. Co.*, 378 U.S. 158, 171, 84 S.Ct. 1710, 1717, 12 L.Ed.2d 775 (1964). Section 7 is violated when "a 'tendency' toward monopoly or the 'reasonable likelihood' of a substantial lessening of competition in the relevant market is shown." *Id.* In determining whether there has been a violation of Section 7 of the Clayton Act, it must be shown that the effect of the acquisition at issue "may be substantially to lessen competition [ ] in any line of commerce in any section of the country." *Philadelphia National Bank*, 374 U.S. at 355, 83 S.Ct. at 1737.[40]

Visa claims that competition in the relevant market would be adversely affected if Sears were to attain Visa membership, and consequently seeks an injunction. Sears, on the other hand, claims that its entry into the Visa system will stimulate competition in the general purpose charge card market.

### A. Standing

█ A private party such as Visa must have standing to seek an injunction under Section 16 of the Clayton Act. Section 16 provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C.A. § 26 (Supp. 1992). However, under Section 16, the threatened injury must be " 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.' " *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50

L.Ed.2d 701 (1977)); *see also Central Nat'l Bank v. Rainbolt*, 720 F.2d 1183 (10th Cir. 1983). In short, to have standing, Visa must have a sufficient stake in a justiciable controversy to seek judicial resolution. *See Sierra Club v. Morton*, 405 U.S. 727, 731–32, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972).

█ Because the antitrust laws were designed to protect competition, not competitors, a mere threat of lost profits, for example, does not normally by itself constitute an appropriate antitrust injury under Section 16. *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Rather, an antitrust "injury should reflect the anticompetitive acts made possible by the violation." *Id.*, 429 U.S. at 489, 97 S.Ct. at 697. In the instant case, unless Visa's alleged injuries are tied to the possibility of decreased competition prohibited by Section 7 of the Clayton Act, Visa has not suffered an antitrust injury and would have no standing to seek injunctive relief.

█ Visa asserts that if Sears is allowed to join the Visa system, Discover will have access to confidential information concerning Visa marketing plans and other strategies. With such information, Visa argues, Sears could develop business plans to Discover's advantage. As such, Discover would have an unfair marketing advantage over Visa issuers which could result in a lessening of intrasystem and intersystem competition. Ultimately, some Visa members would be unable to effectively compete. As a result, Visa's potential injury in such case would be directly related to the decrease in competition in the market.

In another argument to support standing, Visa asserts that Sears will obtain an unfair competitive advantage over other Visa member banks if Sears is allowed to issue Prime Option Visa. This unfair advantage will occur, Visa asserts, because Sears will be able to offer potential cardholders and merchants both Visa and Discover cards which other

---

**40.** "Line of commerce" refers to the relevant product or services market. *Philadelphia National Bank*, 374 U.S. at 356, 83 S.Ct. at 1737. The term "section of the country" applies to the relevant geographical market for the product. *Id.* In the instant case, the parties have agreed that the relevant market is the general purpose charge card market for the United States.

Visa members cannot do. The court finds that it is possible that this unfair competitive advantage could be accompanied by a reduction in competition between the two systems, which could possibly result in harm to Visa members.

Based on these claims of potential injury and decreased competition, the court finds that Visa has standing to bring its Counterclaim under Section 7 of the Clayton Act.

## B. Application of the Merger Doctrine

After standing has been determined, the court must analyze the probable effects on competition in the general purpose charge card market if Sears, the sole issuer of the Discover Card, is allowed to enter the Visa joint venture as one of 6000 member-owners. Visa argues that Sears' attempt to join the Visa system is a "partial merger" of the two companies, and urges the court to analyze the impact on competition by applying antitrust law relevant to mergers. Such a "merger doctrine" analysis has been applied to joint ventures because "the same considerations apply to joint ventures as to mergers, for in each instance we are but expounding a national policy enunciated by the Congress to preserve and promote a free competitive economy." *United States v. Penn–Olin Chem. Co.*, 378 U.S. 158, 170, 84 S.Ct. 1710, 1716, 12 L.Ed.2d 775 (1964).[41]

The instant case does not fit neatly into a merger analysis. Here, if Sears were to join the Visa joint venture, neither corporation would gain complete control of the other. However, there is no doubt that Section 7 applies to this "hybrid" case because, although considered an "anti-merger" statute, the very language of Section 7 makes clear that a "company need not acquire control of another company in order to violate the Clayton Act." *Denver & R.G.W.R.R. Co. v. United States*, 387 U.S. 485, 501, 87 S.Ct. 1754, 1764, 18 L.Ed.2d 905 (1967). The court, therefore, agrees that merger law, although not controlling, is at least a starting point for the analysis required under Section 7.

▪ Under merger analysis, Sears' joining Visa as a member-owner would be characterized as a "horizontal" arrangement[42] because Discover and Prime Option Visa perform "similar functions in the production or sale of comparable goods or services." *Brown Shoe Co. v. United States*, 370 U.S. 294, 334, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962). In general, when an acquisition effects a horizontal merger between companies occupying the same relevant market, competition that previously existed between the two is eliminated. *Id.* at 335, 82 S.Ct. at 1529. When such a merger creates one "firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market," the United States Supreme Court has recognized a prima facie violation of Section 7. *United States v. General Dynamics Corp.*, 415 U.S. 486, 497, 94 S.Ct. 1186, 1193, 39 L.Ed.2d 530 (1974) (quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963)); *see also Brown Shoe*, 370 U.S. at 343, 82 S.Ct. at 1533 (stating market share

---

**41.** *Penn–Olin* involved the joint participation of two corporations in the creation of a third. In comparing such a joint venture to a merger, the Court stated:

> The joint venture, like the "merger" and the "conglomeration," often creates anticompetitive dangers. It is the chosen competitive instrument of two or more corporations previously acting independently and usually competitively with one another. The result is "a triumvirate of associated corporations." If the parent companies are in competition, or might compete absent the joint venture, it may be assumed that neither will compete with the progeny in its line of commerce. Inevitably, the operations of the joint venture will be frozen to those lines of commerce which will not bring it into competition with the parents, and

the latter, by the same token will be foreclosed from the joint venture's market.

*Penn–Olin*, 378 U.S. at 169, 84 S.Ct. at 1716 (footnote omitted).

**42.** The court rejects Sears' assertion that the Clayton Act counterclaim requires an analysis based on a "vertical" merger. If the "merger" here were vertical, Sears would not have been allowed to bring an action under Section 1 of the Sherman Act. Furthermore, what must be examined is the effect on competition if the same parent organization, Sears, were to issue Prime Option Visa and Discover, two competing charge cards. If the "merger" were to occur, Prime Option Visa and Discover would be offering comparable goods, i.e., general purpose charge cards.

resulting from merger is one of the most important factors when determining probable effects on competition). The presumption has been created because significant market concentration makes it "easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level." *FTC v. University Health, Inc.*, 938 F.2d 1206, 1218 n. 24 (11th Cir.1991) (quoting *United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1282–83 (7th Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990)).

■ Evidence of such undue concentration in a market is usually presented in the form of market share statistics designed to signal the potential likelihood of collusion between firms. The most prominent of these statistical methods of measuring market concentration is the Herfindahl–Hirschman Index ("HHI"). *University Health*, 938 F.2d at 1211 n. 12. The HHI is calculated by squaring the market share of each company in the relevant market, and then adding the squares. *Id.* "This formula reflects the distribution of market shares between firms and gives proportionately greater weight to the market shares of the larger firms, which likely accords with their relative importance in any anti-competitive interaction." *United States v. Rockford Memorial Corp.*, 717 F.Supp. 1251, 1279 (N.D.Ill.1989), *aff'd*, 898 F.2d 1278 (7th Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). *Rockford Memorial*, 717 F.Supp. at 1279. When a market consists of many firms of approximately equal size, the HHI approaches zero. *Id.* Once a pure monopoly has been created, however, the HHI reaches its maximum of ten thousand. *Id.*

The United States Department of Justice uses the HHI in assessing possible violations of Section 7. Department guidelines characterize a market as highly concentrated if the HHI exceeds 1800. *University Health*, 938 F.2d at 1211 n. 12 (citing U.S. Dep't of Justice, Merger Guidelines §§ 3.1, 3.11(c), 4 Trade Reg.Rep. (CCH) ¶ 13,103 at 20,560–61 (1988)). In such a concentrated market, any increase of the HHI by 50 or more raises serious antitrust concerns. *Id.* Furthermore, any merger that increases the HHI by more than 100 and results in a post-merger level of 1000 or more signals a red flag. *Id.* In both situations, courts have recognized a prima facie violation of Section 7.

During trial, to rebut Sears' Sherman Act claim, Visa argued that the market for all charge card issuers is highly unconcentrated. This low concentration is obtained when each of the 6000 Visa and MasterCard issuers is viewed as a single company and the market share of each issuer is squared and added together. But in its Clayton Act counterclaim, Visa urges the court to analyze the market on a "system-wide" basis, viewing the Visa and MasterCard joint ventures as single companies. Under such a view, market share would be determined by adding together the individual shares of each system. Such a "system-wide" analysis, which Visa advocates under the Clayton Act, would result in a highly concentrated market.

Based on testimony by Sears' expert, Professor Kearl, Visa asserts that the relevant market shares are as follows: Visa 45.6%; MasterCard 26.4%; Discover 5.5%; American Express 20.5%; and Diners Club 2.0%. Using these figures, Visa claims that the HHI for the general purpose charge card market is 3231,[43] well above the Justice Department's "highly concentrated" merger threshold of 1800. Visa argues that Sears' acquisition of a Visa membership through Prime Option would increase the HHI to 3732,[44] an increase of more than 100 under the merger guidelines.[45] As a result, Visa

---

**43.** This figure of 3231 is obtained by squaring the market shares of each system issuer and then adding the total: $45.6^2 + 26.4^2 + 5.5^2 + 20.5^2 + 2.0^2 = 3231$.

**44.** This figure of 3732 is obtained by adding Discover's market share of 5.5% with Visa's share of 45.6% for a total of 51.1%. That figure is then squared and added to the squares for the other systems: $51.1^2 + 26.4^2 + 20.5^2 + 2.0^2 = 3732$.

**45.** Visa points out that under Dr. Kearl's view of the general purpose charge card market, the market shares of Visa and MasterCard should be combined, yielding a total market share of 72%. Using this figure, Visa asserts that the market would then have a pre-"merger" HHI of 5639, and a post-"merger" total of 6431. This change

claims that it has presented a prima facie case that Sears' proposed membership in Visa would substantially lessen competition in the future.

The court does not agree that the "merger" at issue would result in a significant increase in the concentration of companies in the relevant market under an HHI analysis. First, the court does not find it appropriate to view the general purpose charge card market on a system-wide basis for the purpose of an HHI analysis. Persuasive evidence was presented which showed that intrasystem competition within Visa and MasterCard is vigorous. For example, evidence showed that the Visa and MasterCard systems are not proprietary, but rather are owned by approximately 6000 members. Furthermore, members are free to set their own prices and output, and both systems generally remain open to new members, including significant competitors such as AT & T, GTE and General Motors Corporation. Based on this evidence, the court agrees with Visa's expert Professor Schmalensee that *each* individual issuer of Visa and Master-Card cards should be included in the HHI analysis, resulting in a system HHI of below 500.[46]

■ Next, even if the court were to accept Visa's argument that market share in the general purpose charge card market should be measured on a system-wide basis, the court still does not find merit in Visa's HHI argument. Visa's analysis depends on a true merger between the parties in which Discover's market share would be subsumed within that of the entire Visa system. Such a characterization of the market system, how-

ever, is inaccurate and misleading. The court has found that Discover Card will remain a viable competitor in the relevant market. Visa will have no control over Discover Card, and Sears will not control the Visa system.[47] Consequently, Sears' entry into the Visa system through Prime Option cannot be deemed a merger of Discover Card and Visa. For purposes of the HHI analysis, therefore, the relative market shares of Visa and Discover would not be affected and the HHI would remain unchanged.·

Based on the court's assessment of Visa's HHI argument, the court finds that Visa has not met its burden of showing anticompetitive effects based on the HHI analysis of concentration of companies in the market. *University Health*, 938 F.2d at 1218; *see Philadelphia National Bank*, 374 U.S. at 363, 83 S.Ct. at 1741. Therefore, the court concludes that Visa has not made out a prima facie case under Section 7.

### C. Determination of Anticompetitive Effects

■ Because there has been no prima facie showing of anticompetitive effects by Visa, the court must examine the probable effects of the merger to determine whether there exists a possible substantial lessening of competition or a tendency to create a monopoly in the general purpose charge card market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 317, 82 S.Ct. 1502, 1519, 8 L.Ed.2d 510 (1962). Probabilities are the focus of the inquiry because "section 7 was intended to arrest anticompetitive tendencies in their 'incipiency.'" *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362, 83

in the HHI would make out a prima facie case of a Section 7 violation.

**46.** In making this assertion, the court does not claim that the Visa association lacks market power. Rather, the court believes that the HHI analysis deals strictly with the concept of market shares, and is most helpful in assessing the possible impact on competition when companies combine their market shares through merger or the creation of joint ventures. The court finds, however, that the HHI is not particularly helpful in assessing the impact on competition under the facts of this case.

**47.** The court recognizes that Visa and Discover will not remain entirely independent. Sears, the

owner of Discover, will presumably control a share of the Visa system through Prime Option. However, Sears would be only one of approximately 6000 Visa issuers. Even if Sears were to meet its stated goal of becoming one of the five largest Visa issuers, (*see* Tr. at 187; Def.'s Ex. 72, at S112131), its market share of the Visa system would be less·than 10%. This would not constitute a complete merger of the two entities. At best, it could be called a partial or hybrid merger. Under such circumstances, the court finds that the HHI analysis is not particularly useful in determining the probability of anticompetitive effects.

S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963) (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 317, 322, 82 S.Ct. 1502, 1519, 1522, 8 L.Ed.2d 510 (1962)).

In analyzing the possible harms and benefits, the court should have "a firm understanding of the structure of the relevant market." *Philadelphia National Bank,* 374 U.S. at 362, 83 S.Ct. at 1741; *see Brown Shoe,* 370 U.S. at 321–22, 82 S.Ct. at 1521–22. Without such understanding, it would be difficult for the court to accurately determine what effects Sears' membership in Visa would have on the general purpose charge card market.

### 1. Analysis of the Market Structure

The history of the development of the general purpose charge card market; discussed in the Background section of this Opinion, has led the court to several conclusions regarding the present structure of the market. First, the court finds that the existence of joint ventures, such as Visa and MasterCard, has had a positive effect on competition and consumers. Only large firms with significant capital have the ability to enter the national charge card market as sole proprietors. The national charge card associations, as a result of their open membership policies, allow smaller institutions which would not normally be able to compete to enter the market. With no restrictions on price or output, these joint ventures have further benefitted competition and consumers because many smaller institutions, in order to effectively compete with the larger firms, offer highly competitive interest rates and other features. These conditions have led to healthy intrasystem competition among the members of Visa and MasterCard.

The evidence presented at trial also leads the court to conclude that different brands of general purpose charge cards appeal to different consumer interests. American Express, Diners Club and Carte Blanche appeal to the "transactional" consumer who wants, and has the ability, to pay off the entire balance each month. Visa and MasterCard, on the other hand, appeal to the customer who wants the option of revolving credit. Discover, with its no annual fee and cash-

back features, appeals more to the transactor than the revolver, although clearly there are numerous Discover customers who revolve each month. These choices among the various charge cards promote competition by giving consumers alternatives when choosing which card they prefer to carry, or if they carry more than one card, which one they prefer to use in a particular circumstance.

Finally, the court finds that intersystem competition has helped promote innovation in the development of transactional processing systems and merchant base expansion, thereby benefitting consumers. Therefore, the court concludes that intersystem competition is important in promoting consumer welfare in the general purpose charge card market.

### 2. Effects on Competition

■ Relying on the conclusions made above, the court now turns its attention to the possible effects on the market if Sears were to join Visa as a member-owner. Visa claims that Sears' entry into the joint venture may substantially lessen competition, claiming that harm to competition may occur in two ways: 1) Discover will abandon its merchant discount competition and will cease its direct advertising competition against Visa; and 2) Sears will use its presence on the Visa board to obtain confidential information regarding Visa activities.

In response, Sears has argued that its entry into the Visa system as a member-owner has several benefits for competition. First, Sears claims that intrasystem competition among Visa members will increase due to the presence of the low-cost Prime Option card. In addition, Sears claims that its entry into the Visa system will encourage other companies who wish to issue both a proprietary card and a bankcard (i.e. Visa and MasterCard), to do so. Sears argues that Bylaw 2.06 at present is a disincentive to such companies because the bylaw forces companies to chose one type of card over another, thereby lessening intersystem competition in the general purpose charge card market.

As the fact-finder in the Clayton Act counterclaim, the court has analyzed the possible impacts on competition if Sears were to issue

Prime Option Visa. In determining whether Sears' entry into the Visa system may substantially lessen competition, the court has weighed the possible harms of that entry against the possible benefits. First, the court agrees that intersystem competition will be decreased by Sears' entry into the Visa system as the owner of Prime Option Visa. Sears' ownership of Prime Option Visa will likely cause Sears to change its marketing strategy, thereby decreasing competition between Visa and Discover to a certain degree. However, the court finds that competition between Discover and Visa will be far from eliminated, and Sears will continue to vigorously market the Discover Card.

Discover and Visa appeal to different consumer needs within the general purpose charge card market.[48] By launching Prime Option Visa, Sears does not intend that its customers abandon the Discover Card. Evidence was presented at trial that Sears intends that the Discover Card will "continue to grow in the business and ... remain profitable." (Tr. at 986). Although such testimony may have been self-serving at the time, the court does not believe that Sears intends to abandon the Discover Card after its tremendous capital investment in the program and Discover's apparent unparalleled success. Rather, the evidence indicated that Sears intends Prime Option Visa to target the customer who prefers those features offered by bankcard issuers. The court concludes that the Discover customer to be targeted by Prime Option Visa is the customer who already carries, and uses, a bankcard of some type. Furthermore, the court believes that Sears' entry into the Visa system will not prompt the remaining 6000 Visa members to stop advertisements and promotions aimed at the Discover Card market. If Discover remains a healthy competitor, which

the court believes it will, Visa will continue to have the incentive to vigorously compete.[49]

The second possible impact on competition the court must assess is based on Sears' acquisition of confidential information regarding Visa's activities. The court agrees with Visa that Sears' presence on the Visa Board raises a concern regarding confidential information, and will likely cause a decrease in intersystem competition. *See F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.,* 597 F.2d 814, 818 (2d Cir.1979). However, the court finds that Visa has alternative remedies to this problem short of denying Sears membership in the Visa joint venture. It is certainly within Visa's power to provide for sanctions, including loss of membership, for any Visa member who shares confidential information with a competitor. As a result, the court finds the potential negative impact on competition is negligible.

Next, the court must assess the possible impact that Prime Option Visa may have on intrasystem competition. Sears claims that Prime Option Visa will stimulate intrasystem competition among Visa issuers. The court agrees that intrasystem competition may be increased in the short run by the entry of a lower-cost card such as Prime Option into the Visa system. This conclusion is supported by evidence at trial, including testimony by Visa's own expert as well as evidence that indicates an increase in competition following AT & T, GTE, and GM's entries into the Visa and MasterCard systems. The court, however, is not convinced that this increase in intrasystem competition will continue over the long run. In fact, in the court's opinion, it is merely a matter of time before Prime Option Visa becomes one of the largest members in the Visa system. As such, like the other large issuers, Prime Option will have an incentive to maintain high-

**48.** The court notes that competition between Visa and MasterCard decreased following duality. The court believes that one significant reason for this change was due to the fact that Visa and MasterCard are nearly identical products, appealing to the same consumer needs.

**49.** Although the court must assess probabilities which might result from Sears' entry into the Visa system, it is difficult to properly assess whether American Express will follow Sears'

lead and seek Visa membership. American Express issues the Optima "revolver" card and the "transactional" green card, but the court does not have facts before it concerning the type of consumer targeted by the Optima card. As a result, the court declines to conclude that American Express would also enter the Visa system, causing a lessening of competitive vigor of the Optima card.

er-than-average interest rates. In the long-run, intrasystem competition may not be enhanced to any appreciable degree.

Finally, the court must examine Sears' argument that its entry into the Visa system will encourage other firms to issue both proprietary cards and bankcards, thereby increasing both intersystem and intrasystem competition. Sears makes this argument by asserting that Bylaw 2.06 is a disincentive to firms interested in issuing both a bankcard and a proprietary card. The court agrees that competition will be enhanced, but only to a small degree.

The court reaches this conclusion because very few firms are in a position to issue both a bankcard and a proprietary card due to the large amount of capital required to begin a proprietary card. However, because of the small number of systems in the general purpose charge card market, if just one firm is discouraged from issuing a proprietary card because of Bylaw 2.06, it would have a negative impact on competition in this market. The court is persuaded that such a possibility does exist after reviewing Visa's own exhibit listing twenty-one Visa members considered to have the capability of issuing their own proprietary cards.[50] However, the court finds the possible benefit derived from this "incentive" to be minor because even those firms with the capability are unlikely to undertake the high risk and large capital investment required to launch a proprietary card.

## D. Conclusions Regarding Clayton Act Counterclaim

■ In analyzing the "acquisition" at issue in this case, the court concludes that there has been no showing that Sears' entry into the Visa system as a member-owner may substantially lessen competition in the general purpose charge card market. First, Visa has not made a prima facie showing of a Section 7 violation because Sears' joining Visa does not constitute a true merger. Furthermore, in analyzing the possible effects of Sears' entry into the Visa system, the court agrees that the probable harms to competition will outweigh the probable benefits, but not so substantially as to rise to the level of a Section 7 violation.

In quantifying the possible harms and benefits to competition, the court agrees that intersystem competition will likely be harmed because Discover will not compete as vigorously with Visa after it issues Prime Option, and Sears will have access to confidential Visa information. However, these probable harms will not be significant. Sears intends the Discover Card to remain strong in the general purpose charge card market, and Visa has means by which it can control the dissemination of confidential information.

These probable harms to competition are weighed against the probable benefits of Sears' entry into the Visa system. The court has found that these benefits are slight, but they offset the harms to some degree. Consequently, in weighing the possible effects, the court concludes that Visa has failed to show that competition in the general purpose charge card market may substantially lessen if Sears joins the Visa system.[51] Based on the foregoing, the court holds that Sears' entry into the Visa joint venture as a member-owner will not violate Section 7 of the Clayton Act. For that reason, Visa's Coun-

**50.** *See* Pl.'s Ex. 297, at 70201150. The parent organizations of these 21 Visa members include such prominent companies as the Ford Motor Company, Merrill Lynch, Kemper Insurance, ITT, J.C. Penney, and Aetna Life & Casualty Co. *Id.*

**51.** The court's factual attitudes toward Sears' Sherman Act claim and Visa's Clayton Act counterclaim are identical. In both situations, the court sees the entry of Sears into Visa as slightly more harmful than helpful to competition, although not substantially more harmful. If before this litigation was ever commenced, the trial judge had been given the authority to tell Visa what it could or could not do under the antitrust laws, and Visa had then inquired whether it could keep Sears out of Visa, the answer would have been "yes." Conversely, if Visa had asked whether it could let Sears in the association, the answer would have also been "yes." Unfortunately for Visa, only the latter question was directed to the court while the former went to the jury, which said "no."

terclaim is DISMISSED.[52]

## III. VISA'S MOTION FOR NEW TRIAL

Visa seeks a new trial pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure. Rule 59 allows the court to grant a new trial "upon any grounds which, in the sound judgment of the trial court, [are] in the interest of the proper administration of justice." *Tidewater Oil Co. v. Waller*, 302 F.2d 638, 642–43 (10th Cir.1962). For such purposes, the court need not view the evidence in the light most favorable to the non-moving party, but is allowed to weigh the evidence and the credibility of witnesses. *Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1266–67 (8th Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987); *see Holmes v. Wack*, 464 F.2d 86, 88–89 (10th Cir.1972).

### A. The Weight of the Evidence

■ Visa first argues that the jury's verdict in Sears' favor is against the weight of the evidence, and therefore, it is entitled to a new trial. As discussed previously, although the court may not agree with the jury's verdict, it cannot and does not hold that the verdict is so overwhelmingly against the weight of the evidence that a new trial should be granted.

### B. Essential Fairness of the Trial

Visa next argues that it is entitled to a new trial because the trial was fundamentally unfair and materially prejudicial to its position. Specifically, Visa argues that it was denied a fair trial because (1) Sears' trial tactics placed excessive emphasis on issues that were only marginally relevant to a Section 1 claim; (2) the court refused to give limiting instructions requested by Visa, compounding the injustice inflicted on Visa by Sears' trial

strategy; and (3) Sears did not present a proper antitrust lawsuit.

#### 1. Sears' Trial Tactics

Visa complains that Sears engaged in trial tactics which undermined its right to a fair trial. Specifically, Visa argues that (1) Sears improperly raised an accusation of discrimination against Visa; (2) Sears' emphasis on Visa's "anti-Discover" campaign was prejudicial to Visa; (3) Sears' assertion of a "multicard strategy" undermined Visa's right to a fair trial; and (4) Visa was prejudiced when Sears invited the jury, by its verdict, to give consumers the "right to choose" whether Prime Option Visa should enter the market.

■ First, Visa complains that Sears improperly accused it of "discrimination." Sears presented evidence to show that one Visa member, Citibank, is allowed to issue both Diners Club and Carte Blanche as proprietary cards, while retaining its membership in Visa. This evidence, Visa argues, was improperly used to suggest that Visa acted unfairly and discriminatorily toward Sears, thereby prejudicing Visa in the eyes of the jury. Visa submits that the argument encouraged the jury to base its verdict on passion, prejudice, and notions of "fairness," rather than the governing antitrust laws.

Similarly, Visa argues that it was harmed by evidence of the "anti-Discover campaign." At trial, Sears presented evidence designed to show that shortly after the issuance of Discover, Visa took steps to hamper its success. Visa argues that Sears used this evidence to unfairly prejudice the jury, and to encourage an improper verdict.

The court finds, however, that neither of these trial tactics prejudiced Visa so as to require a new trial. With respect to these issues, the court gave a limiting instruction

---

**52.** Sears argues that the court is precluded from rendering a verdict in favor of Visa on the Clayton Act counterclaim unless the court also grants Visa's motion for judgment as a matter of law. Sears bases this assertion on the doctrine of collateral estoppel or issue preclusion.

It appears to the court that the better reasoning is that despite the jury's verdict, the court is not precluded from deciding the Clayton Act claim. *See Milonas v. Williams*, 691 F.2d 931, 935 (10th Cir.1982), *cert. denied*, 460 U.S. 1069,

103 S.Ct. 1524, 75 L.Ed.2d 947 (1983) (trial judge entered permanent injunction against defendants despite jury's prior verdict in favor of defendants on damages issue). The court is not persuaded that collateral estoppel is applicable because of the different standards applied to the two causes of action at issue. Determination of the collateral estoppel issue, however, is not necessary here as the court does not find sufficient evidence to sustain a Clayton Act violation.

to the jury. The court instructed "that there is no contention or allegation in this case that any of these activities was unlawful.... This evidence was admitted so that you might understand the workings of the marketplace and the intent of the parties, in order to help you decide what effect the passage and enforcement of the amendment to Bylaw 2.06 has on competition in the relevant market." Jury Instruction No. 20.[53] Visa's counsel proposed this language and did not object to the instruction. Given the fact that the jury was instructed as to the proper use of this evidence, the court does not find that its inclusion undermined Visa's right to a fair trial.

■ Visa next asserts that its right to a fair trial was hindered by Sears' evidence of a "multi-card strategy." At trial, Sears presented evidence that it intended to pursue a multi-card strategy from the outset. The evidence stated that prior to development of the Discover Card, Sears had decided to first issue a national proprietary charge card and then issue a national bank card such as Visa or MasterCard. Sears officers testified that they would not have issued Discover as a proprietary card had they known that such a decision would subsequently disqualify Sears from membership in Visa. Visa failed to object to this evidence when it was mentioned during Sears' opening statement and when it was presented during trial. However, Visa moved for a mistrial the day after this evidence was presented to the jury. At that time the court found that Visa had waived its right to object by failing to make a timely objection. Visa now raises the objection again in support of its motion for a new trial.

Again, the court rejects Visa's arguments on this point. The court finds that Sears presented this evidence to show that Bylaw 2.06, had it been in place when Sears first contemplated issuing a proprietary card, would have acted as a disincentive to Sears. The evidence was relevant to show that others may have had a similar disincentive. This evidence was also relevant to help the jury have a better understanding of the marketplace. In any case, the jury was instructed to base its verdict on the relevant antitrust laws, and not to be swayed by perceptions of fairness. Accordingly, the court finds that the evidence of Sears' multi-card strategy was relevant to the antitrust claim and was not unfairly prejudicial.

■ Finally, Visa asserts that Sears raised improper arguments during closing argument. Specifically, Visa objects to Sears' arguing that the jury should give consumers the "right to choose" whether Prime Option Visa may enter the marketplace. Visa claims that this argument is not legally relevant and was calculated to mislead the jury.

The court rejects this contention as well. First, Visa failed to raise an objection during the closing argument. Because of this fail-

---

53. The entire text of Instruction 20 reads as follows:

During the trial you have heard evidence about certain business activities and decisions by both Sears and Visa. For example, you have heard evidence that Sears has refused to accept Visa cards in its department stores and that Visa has refused to let Sears issue a Visa card while permitting one of its members to issue Diners Club and Carte Blanche cards. You have also heard evidence about certain activities Visa undertook or encouraged its members to undertake after the Discover card was launched in early 1986 for the purpose of impeding Discover's success.

With regard to these various activities and decisions by Sears and Visa, I instruct you that there is no contention or allegation in this case that any of these activities was unlawful. It is permissible for firms to choose how and with whom they will do business as long as such activity does not violate the antitrust laws. The antitrust laws do not necessarily require businesses to deal with similar firms in a similar manner. This evidence was admitted so that you might understand the workings of the marketplace and the intent of the parties, in order to help you decide what effect the passage and enforcement of the amendment to Bylaw 2.06 has on competition in the relevant market. You should give this evidence such weight, if any, that you believe it deserves in considering the actual antitrust claim made by Sears in this case regarding the competitive effect of Visa Bylaw 2.06.

Additionally, you have heard evidence concerning the fairness of certain activities undertaken by both parties. You are to consider such evidence only as it relates to or helps you understand the effect of the amendment to bylaw 2.06 on competition in the relevant market.

ure to object, the court had no opportunity to cure any error. Accordingly, Visa has waived its right to object now. 9 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2472 (1971) ("A party will not be allowed to speculate with the court by letting error go unremarked and then seek a new trial on the basis of error if the outcome of the case is unfavorable to him.") In addition, the jury was instructed to follow the court's instruction of law with respect to the Sherman Act, and not the argument of counsel. Furthermore, it does not appear to the court that the comments complained of were harmful, clearly improper, or beyond the bounds of permissible argument. Consumer choice is the essence of competition. So long as the argument was focused on competition, the court finds that it was proper.

### 2. Supplemental Jury Instructions

■ Visa argues that the court erred in not giving certain of its proposed jury instructions. Specifically, Visa complains that it was prejudiced by the court's refusal to give Visa's proposed instructions 101, 102, and 103. Proposed Instruction 101 addressed the anti-Discover campaign,[54] Instruction 102 addressed the issuance of Carte Blanche and Diners Club charge cards,[55] and

---

54. The entire text of Visa's Proposed Instruction 101 reads as follows:

During the trial you have heard evidence about certain activities that VISA undertook or encouraged its members to take after the Discover card was launched in early 1986 for the purpose of impeding or preventing Discover's success. You have further heard testimony concerning what effect, if any, those activities had on the success of Discover.

That evidence was admitted so that you might understand the workings of the marketplace including, in particular, the relations between the parties to this case. However, I instruct you that there is no contention or allegation in this case that such activities by VISA or its members were wrongful or that they violated the antitrust laws. As I have previously instructed you, it is the purpose of the antitrust laws to encourage vigorous competition. Accordingly, you should give evidence concerning VISA's activities in response to the introduction of the Discover card such weight, if any, that you believe it deserves in considering the actual antitrust claims made by Sears in this case, about which I previously have instructed you. However, you may not base any finding in this case upon a determination that the anti-Discover campaign was itself unlawful or anti-competitive.

55. Visa submitted two versions of its Proposed Instruction 102. Version A reads as follows:

You have heard evidence in this case about the fact that VISA has permitted others to become members of VISA since By–Law 2.06 was enacted and that it permits its members to issue other general purpose cards, such as MasterCard, Diners Club and Carte Blanche.

The only issue before you is whether VISA By–Law 2.06 has unreasonably restrained competition in the market for general purpose charge cards in the United States. As to that issue, I instruct you that evidence concerning the issuance of other cards or the admission of other new members does not tend to prove that By–Law 2.06 is anti-competitive. The antitrust laws do not require businesses to deal with like firms in a like manner. This evidence was admitted solely to provide you with a full factual understanding of market facts which might be pertinent to the relations of the parties.

Visa's proposed Version B reads:

You have heard evidence on this case about the fact that VISA has permitted other firms to become members of VISA since By–Law 2.06 was enacted and that it permits its members to issue other general purpose cards, such as MasterCard, Diners Club and Carte Blanche.

The parties have submitted conflicting evidence on the nature and extent of the competition from such other card programs or systems and it is for you to resolve such conflicts. However, I instruct you that the antitrust laws do not require VISA to deal on the same or equal basis with other parties, be they members or non-members. Unless the effect of VISA By–Law 2.06 is to unreasonably restrain competition in the relevant market, a business such as VISA is free to determine for itself the parties with whom it will do business or share its property and it does not violate the antitrust laws for it to do business or share property with certain firms while refusing to do so with others, even others that are similarly situated.

Evidence concerning VISA's treatment of other firms has been admitted for the sole purpose of permitting you to understand the facts relevant to the market for general purpose credit cards and to help you evaluate VISA's purpose in enacting By–Law 2.06 in accordance with my prior instructions to you regarding intent. As the sole judges of the facts, you should resolve any conflicts in the evidence on this subject as you deem appropriate and should give this evidence such weight, if any, as you believe it is entitled on the issues I have mentioned. However, I instruct you that no finding of anti-competitive effect may be based upon the fact that VISA did not treat Sears and its affiliates in the same manner as it treated other businesses, whether or not you

Instruction 103 sought to preclude the jury from considering evidence of Sears' multi-card strategy.[56] These instructions were designed to instruct the jury to disregard certain evidence which Visa considered to be irrelevant and/or prejudicial.

The court finds, however, that it was not necessary to give these instructions. The basic concerns articulated in Visa's proposed instructions were addressed by the court's Instruction 20. As discussed in Part I of this Opinion, the disputed evidence was relevant to the antitrust claim. It was not necessary to prohibit the jury from considering such evidence, especially in light of Instruction 20 which limited the jury's use of such evidence.

 As to Visa's Proposed Instruction 103, which sought to preclude the jury from considering evidence of Sears' multi-card strategy, the court again rejects Visa's argument. This instruction was an attempt by Visa to exclude evidence to which it failed to timely object and which the court has found to be relevant to Sears' disincentive argument. The court's refusal to give the proposed instruction was not prejudicial.

### 3. The Propriety of Sears' Antitrust Case

Visa finally argues that Sears did not try a "proper" antitrust case. Visa seems to argue that because it lost at trial, and because it had such a far superior case, Sears must have presented an improper case. However, the court does not in any way find that Sears tried an improper case. Sears' case was clearly effective and was tried in such a way that the jury understood Sears' position. Visa failed to object to any impropriety of this nature during the trial. Visa had every opportunity to present all evidence it chose to present. If Visa felt that certain antitrust issues were not sufficiently illuminated, it could have presented evidence to that effect to the jury. The jury system was fully utilized and available to both sides under the rules of civil procedure and the rules of evidence.

Based on the foregoing, Visa's motion for a new trial is DENIED.

### SUMMARY AND CONCLUSION

For all of the above reasons, the verdict of the jury will stand. Visa's legal argument is without precedent and is contrary to the law of the Sherman Act. What Visa has, and has had from the beginning, is a factual argument that it wants to turn into a legal argument. It is understandable for Visa member banks to feel that it is somehow unfair that they should be required to allow one of their most successful rivals into their association.

Based on its exclusion from the Visa association, Sears filed suit under Section 1 of the Sherman Act, which clearly prohibits "combinations" unreasonably in restraint of trade. If Visa were a single entity the suit would have been summarily dismissed, but Visa is not a single entity. It is a combination of 6000 financial institutions, all of whom are joined together in a worldwide credit system whose modest goal is to be "everywhere you want to be." As a combination, Visa is subject to a Section 1 suit. As an allegedly efficiency-enhancing joint venture, Visa escaped a finding of *per se* illegality, and was entitled to a full Rule of Reason inquiry. This case is as simple as that, Visa's protestations and legal theses to the contrary.

Visa would have this court remake the Sherman Act to exempt this particular joint behavior from full antitrust scrutiny. It urges an extension of the concept of essential facilities into a legal requirement in refusal to deal cases, a meritless argument that, if

---

consider the reasons for such treatment to be fair.

**56.** The entire text of Visa's Proposed Instruction 103 reads as follows:

Sears has introduced evidence that in 1983 it adopted a multi-card strategy, that it did so in reliance upon VISA's membership rules as they then existed and that if Sears had known that VISA would thereafter change its membership rules Sears might have made different business decisions with respect to how it chose to enter the general purpose charge card mar-

ket. VISA has offered contrary evidence on these issues.

This evidence was admitted solely for the purpose of permitting you to understand the history of the relationship between the parties. I now instruct you that no claim of anticompetitive effect may be based on this evidence. There is no claim in this case, nor can there be, that VISA has violated the anti-trust laws by interfering with Sears' alleged multi-card strategy.

adopted, would practically eliminate as potential antitrust plaintiffs all but the bankrupt, the defunct, and the discredited. Visa urges, as a matter of law, recognition of special antitrust deference to this type of joint venture in this type of circumstance. The argument is novel, but it has no support whatsoever in the law.

Visa's argument does have support in the facts, and Visa presented to the jury a credible and well-organized factual case. Sears did the same. Visa received what it was entitled to: a trial. Sears availed itself of the jury system, as was its constitutional right. The jury was by all indications attentive and diligent. The jurors sat patiently through three and one-half weeks of trial. They deliberated for two full days. During their deliberations, they asked to look at a transcript of the trial, which was provided to them. Each juror was given a set of the court's instructions on the law, which they were allowed to keep during deliberations. They were on time. They took notes. The jurors willingly did everything they were asked to do. Their task as fact-finders was not an easy one, and they carried it out in an admirable and conscientious fashion. They reached a verdict fairly and unanimously. Each juror was polled after the verdict was read. There was no doubt about their decision. It was reasonably based on the plaintiff's view of the evidence. Even though the trial judge may well have decided the Sherman Act claim differently than the jury, it was not mere "puffing" when he told the jury in instruction number two that "you are the exclusive judges of the facts."

This result is a proper validation of our jury system. To hold otherwise would be an unauthorized use of the court's powers. To grant Visa's legal motion would be to remake the law and thereby invade the province of Congress; to grant Visa's motion for a new trial or judgment notwithstanding the verdict would be to improperly intrude into the jury's exclusive domain. The court will do neither.

IT IS SO ORDERED.